INMATES OF the ATTICA CORRECTIONAL FACILITY et al., Plaintiffs-Appellants,

v.

Nelson ROCKEFELLER, Governor, State of New York, et al., Defendants-Appellees.

Nos. 284, 334, Dockets 71–1931, 71–1994.

United States Court of Appeals, Second Circuit.

Argued Nov. 5, 1971.

Decided Dec. 1, 1971.

Lumbard, Circuit Judge, filed a concurring opinion.

Oakes, Circuit Judge, filed an opinion concurring in part and dissenting in part.

Phylis Skloot Bamberger, William E. Hellerstein, New York City (Barbara Shapiro, The Legal Aid Society, New York City, Herman Schwartz, ACLU Prisoners Rights Project, Buffalo, N. Y., Stanley Bass, NAACP Legal & Educational Fund, Inc., Daniel Pachoda, National Lawyers Guild, Morton Stavis, Center for Constitutional Law, New York City, Vincent Doyle, Jr., Buffalo, N. Y., Haywood Burns, National Conference of Black Lawyers, New York City, on the brief), for appellants.

Maxwell B. Spoont, Asst. Atty. Gen., State of N. Y. (Louis J. Lefkowitz, Atty. Gen., by Robert E. Fischer, Deputy Atty. Gen., David M. Richman, Roger W. Bradley, Asst. Attys. Gen. on the brief), for appellees.

Before LUMBARD, MANSFIELD and OAKES, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal by certain prisoners of New York State's Attica Correctional Facility (Attica), a maximum security prison, seeks reversal of orders of the United States District Court for the Western District of New York entered on September 28, October 6 and 7, 1971, denying their application for a preliminary injunction restraining defendants from engaging in conduct allegedly violating plaintiffs' constitutional rights and dismissing their complaint insofar as it sought permanent injunctive relief and an order permitting it to be maintained as a class suit on behalf of all inmates, approximately 2,000 in number. Federal jurisdiction was invoked on the basis of 42 U.S.C. § 1983 and 28 U.S.C. § 1343. For the reasons hereinafter stated we affirm the district court's decision in part, reverse it in part, and remand the case for further proceedings in accordance with this decision.

The action is based upon events following the bloody recovery by New York State of control of Attica on September 13, 1971, at a cost of 43 lives, after unsuccessful negotiations to terminate peacefully a four-day inmates' riot. Beginning on September 9, 1971, certain inmates of Attica revolted, took over control of a portion of the prison known as Cellblock D, seized and held 38 correctional officers and civilian employees as hostages, presented a list of demands, which became the subject of negotiations with representatives of the State, and threatened to kill the hostages unless their demands were met. The riot continued until September 13, 1971, and was accompanied by criminal conduct on the part of some inmates, undoubtedly witnessed by others. One guard, William Quinn, a hostage removed from the prison before it was retaken, died of severe head injuries sustained during the uprising, and three inmates succumbed to knife wounds.

On the morning of September 13, 1971, New York State Police and other State employees, acting under the direction of the Commissioner of Corrections of the State of New York, regained control of Attica by armed force, resulting in the death of an additional 29 inmates and 10 hostages, injuries to numerous others (83 required surgical treatment) and destruction of property (in addition to that already destroyed in the uprising).

On the evening of September 13, 1971, a group of lawyers headed by Herman Schwartz, Esq., a professor of law at the University of Buffalo, acting as counsel for all inmates of Attica on the basis of having been attorney for some of them in prior unrelated proceedings, commenced an action in the United States District Court for the Western District of New York entitled "Inmates of Attica Correctional Facility, Plaintiffs, against Commissioner of Corrections Russell G. Oswald and Vincent Mancusi, Superintendent, Attica Correctional Facility." [1] They sought access to Attica and a preliminary injunction against interrogation of prisoners. On September 14, Judge Curtin denied the application after taking testimony of Walter Dunbar, Executive Deputy Commissioner of the New York State Department of Correctional Services, to the effect that no

---

[1]. On September 14 the names of Mariano Gonzales and Peter Butler were added as plaintiffs, and Nelson Rockefeller, Governor of the State of New York, as a defendant.

At approximately the same time, acting on behalf of Mr. Schwartz, an attorney named Willard H. Myers, Esq., commenced a separate action on behalf of Attica inmates in the New York Supreme Court for Erie County and applied to the Hon. Carman F. Ball of that court for an order granting attorneys access to Attica for consultation with inmates. On September 21, 1971, Justice Ball heard the application, reserved decision and gave Mr. Myers until September 28 to file a supporting memorandum and representatives of the State (Assistant Attorneys General Ricotta and Richman) until October 5 to reply.

Although Justice Ball has apparently been prepared to proceed with plaintiffs' lawsuit, which is still pending, plaintiffs apparently preferred the federal forum and chose not to file the memorandum promised to Justice Ball, or to obtain an extension of time to do so.

investigations had as yet been instituted by correctional personnel at Attica. It was further elicited that Governor Rockefeller, upon the recommendation of Hon. Harry D. Goldman, Presiding Justice of the Appellate Division, Fourth Department, had appointed a panel of five impartial observers who would visit and examine conditions at Attica "to the end that the public at large may be assured that the constitutional rights of the inmates are being protected.".[2] Accordingly Judge Curtin denied preliminary injunctive relief for failure to make a sufficient showing of immediate need.

Two days later Governor Rockefeller appointed Deputy Attorney General Robert E. Fischer to investigate any crimes committed at Attica during and after the period of the uprising.[3] Beginning in the latter part of September, Fischer and several members of his staff began interrogation of Attica inmates.

On September 16, 1971, Judge Curtin reopened the application for temporary injunctive relief upon Mr. Schwartz's submission of an affidavit to the effect that counsel were being denied access to Attica for the purpose of giving legal advice to their clients, and upon his further oral statement that he had been approached by a person (Watson) with

"newly discovered evidence" showing the need for access in order to protect the constitutional rights of inmates. Testimony was then taken from James Watson, a 24-year old National Guardsman and a student at Buffalo Law School, regarding reprisals taken by correctional officers against inmates immediately after the uprising had been quelled, including physical abuse, assaults, forcing of prisoners to run a gauntlet of correctional officers who struck them as they passed through, threats, racial slurs and obscenities, which he had witnessed on September 13, 1971, when he and 100 members of his company were sent into Attica to restore order immediately following its being recaptured. Following this hearing, the inmates' purported counsel were permitted by the Commissioner of Corrections to interview inmates daily at the rate of approximately 20 per day (or a total of about 100) during the five-day period from September 17 to 21 inclusive, with the assurance that such interviews could be continued.

On September 23 plaintiffs' counsel applied to the district court for an order (1) enjoining defendants' interrogation of inmates except after each inmate had "consulted with counsel and thereafter only in the presence of counsel," (2) en-

---

2. On September 15 five members were appointed by the Governor:

"Donald H. Goff, General Secretary of the Correctional Association of New York; Clarence B. Jones, Editor and Publisher of the Amsterdam News; Austin MacCormick, Executive Director of the Osborne Association, Inc.; Louis Nunez, National Executive Director of Aspira of America, Inc.; and Robert P. Patterson, Jr., member of the law firm of Patterson, Belknap & Webb."

See Report of The Goldman Panel to Protect Prisoners' Constitutional Rights, November 18, 1971.

3. On October 29, 1971, a Grand Jury was convened in Wyoming County, pursuant to the Governor's Executive Order dated October 29, 1971, for the purpose of examining into

"[A]ny and all criminal actions and proceedings which may be had or taken

by or before said grand jury and grand juries concerning or relating to any and all acts heretofore or hereafter committed or omitted or alleged to have been committed or omitted, relating to, in any way connected with, or occurring during the possession and control of a portion of Attica Correctional Facility by inmates of said facility, located in Wyoming County, between on or about September 9, 1971 and September 13, 1971 and the resumption of possession and control thereof by lawful authorities including, but not limited to, violations of any provision of law relating to the commission of criminal acts or omissions, the investigation, detection, apprehension and prosecution of the person or persons believed to have committed the same and of any offense arising out of such investigation and prosecution, and the conduct of persons, public servants, agents and officers; . . . ."

joining destruction, confiscation and disposal of plaintiffs' personal property, including briefs, transcripts, correspondence, etc., (3) requiring defendants to deposit with the court all photographs and films relating to the "disturbance" at Attica during the period September 9–13, (4) declaring that the action might be maintained as a class suit pursuant to Rule 23, F.R.Civ.P., (5) furnishing plaintiffs' counsel with the "name, prison number and present whereabouts of each member of the class of plaintiffs," (6) requiring defendants to provide plaintiffs' counsel with autopsy and other reports regarding persons killed in connection with the Attica uprising, and (7) appointing federal monitors, who would have free access throughout Attica, to insure enforcement of the injunction against interrogation of inmates and destruction of their property.

On September 25, 1971, defendants applied for an order pursuant to Rules 23 (c) (1) and 12 (b) (6), F.R.Civ.P., dismissing the complaint for failure to state grounds for maintenance of the action as a class suit and for failure to state a claim entitling plaintiffs to relief.[4]

At a hearing held on September 27, 1971, by Judge Curtin upon the foregoing applications, defendants disclosed that in recognition of plaintiffs' right to consult with counsel before being interrogated by representatives of the Attorney General's office with respect to the Attica uprising, Fischer had distributed to all inmates a notice in English and Spanish dated September 24, 1971 (a copy of which in English is printed in a footnote),[5] advising each inmate of his right to speak to a lawyer before being questioned by a representative of the Attorney General's office and giving him the option of writing the name and address of his lawyer so that the lawyer might be informed or asking the court to appoint a lawyer to speak with him. Furthermore, as a result of arrangements made by the Goldman Panel, three

4. As a result of the information gained from their interviews of inmates, plaintiffs' counsel on September 27 filed an amended complaint adding five additional named plaintiffs (Blyden, Clark, Champen, Jackson and Holly) and adding Robert E. Fischer, Deputy Attorney General, as a defendant. The amended complaint alleged that since their re-establishment of control over Attica defendants had, in violation of the inmates' constitutional rights, assaulted, threatened and abused inmates, kept them in an "incommunicado status," denied them prompt access to their attorneys and medical personnel, limited their interviews with counsel to eight (8) hours per weekday and to six hours on Saturday and Sunday, confiscated and destroyed their legal and other personal belongings and commenced a series of official interrogations by correctional officials without notice to plaintiffs' attorneys and without according them the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5.             "NOTICE
TO THE INMATES OF THE
ATTICA CORRECTIONAL
FACILITY
In the near future you may be questioned by representatives of the Attorney General's Office concerning the events which occurred prior to, during and after the period of Thursday, September 9, 1971 through Monday, September 13, 1971.

If you want to speak to a lawyer before you are questioned and you have your own lawyer, write his name here . . . . . . . . . . . . . . . . . . . . . . . and his address (if known) here so that he will be informed . . . . . . . . . . . . . . . . . . . . . . . If you do not have your own lawyer or cannot afford one, a court will appoint one free of charge. If you want a court to appoint a lawyer to speak with you, check this box ☐

If you do not want to see a lawyer now, or you cannot make up your mind, you will be asked again when you are questioned and you can make up your mind at that time.

Please sign your name and inmate number, put this notice in the envelope given to you, seal the envelope and give it to the person who handed this paper to you.

. . . . . . . . . . . . . . . . . . . . . . . . . . .
(Name)
. . . . . . . . . . . . . . . . . . . . . . . . . . .
(Inmate Number)
Robert E. Fischer
Deputy Attorney General
September 24, 1971"

rooms were made available daily in Attica for attorney-client interviews, despite the cramped conditions resulting from damage to B, D and E Cellblocks which required transfer of inmates to other Blocks or to other prisons. These rooms have been available for such purpose eight hours a day except for Saturdays and Sundays, when attorneys may have access for six hours a day. As a result 195 interviews took place during the period from September 17 through October 2.

The district court denied plaintiffs' demand for an injunction against interrogation of prisoners except after being advised by, or in the presence of, counsel, referring to the foregoing notice and pointing out that facilities had been made available for counsel to interview inmates and that if defendants' interrogations violated inmates' rights, objections might be raised in state court upon an attempt by the State to use any information received in a criminal or other proceeding. He concluded that "until plaintiffs can be more specific with regard to how these interviewing circumstances constitute a denial of effective assistance of counsel, of equal protection of the laws, and of the right to be free from cruel and unusual punishment, plaintiffs' demand for an injunction enlarging the interviewing circumstances is denied without prejudice."

On September 30, October 4 and 5 Judge Curtin held further hearings for the purpose of receiving proof (in addition to the previously-received testimony of James Watson) with respect to the undismissed balance of plaintiffs' application for preliminary injunctive relief. Plaintiffs offered the testimony of Vincent Mancusi, Superintendent of Attica, Clarence B. Jones, a member of the Goldman Panel, Arthur O. Eve, a member of the New York State Assembly, and six inmates (Lott, Champen, Blyden, Jackson, Colvin and Haynes).

In support of plaintiffs' allegations of unconstitutional interrogations of prisoners, the sole testimony was that of an inmate Charles Colvin and of Superintendent Mancusi. Colvin, who is serving a term of from 3 to 10 years for manslaughter, testified that on September 13 he was beaten and questioned by correction officers with respect to the events of September 9–13, and that on September 15 he was taken from his cell to a room in the administration building where, after being threatened by two or three people dressed in "BCI" (Bureau of Criminal Investigation) clothes, he signed a "piece of paper" or "a pad" without reading it or knowing what was on it. He further testified that although he was due to be released on October 6, 1971, he had been stripped of 180 days good time without any hearing after he pleaded not guilty to a charge of possession of an officer's night stick.

Superintendent Mancusi, on the other hand, countered that neither he nor any members of his staff had engaged in interrogation of inmates and that he had ordered his staff not to engage in such interrogation. As far as he knew the only interrogation of inmates conducted at Attica was that carried on by Deputy Attorney General Fischer and his staff and by the inmates' own counsel. Mr. Fischer had further requested visiting public officials, including members of the Goldman Panel, not to engage in interrogation of inmates because of his concern for their constitutional rights. With respect to Colvin's testimony as to his being stripped of 180 days good time, Mancusi testified that Colvin had pleaded guilty rather than not guilty to the charge of possession of an officer's night stick and that notwithstanding this plea Mancusi had vacated the punishment after consultation with a member of Fischer's staff.

By contrast, in support of plaintiffs' Eighth Amendment claims, detailed evidence was furnished by plaintiffs to the effect that beginning immediately after the State's recapture of Attica on the morning of September 13 and continuing at least until September 16, guards, State Troopers and correctional personnel had engaged in cruel and inhuman abuse of numerous inmates. Injured prisoners, some on stretchers, were struck, prodded or beaten with sticks, belts, bats

or other weapons. Others were forced to strip and run naked through gauntlets of guards armed with clubs which they used to strike the bodies of the inmates as they passed. Some were dragged on the ground, some marked with an "X" on their backs, some spat upon or burned with matches, and others poked in the genitals or arms with sticks. According to the testimony of the inmates, bloody or wounded inmates were apparently not spared in this orgy of brutality.

There was testimony that hand in hand with the physical violence upon the inmates went threats of death or further brutality. Correctional officers, addressing inmates as "niggers" or "coons," threatened to "get rid of" them or shoot or kill them. In at least one instance, the testimony ran, a guard pointed a gun at an inmate's head, telling him that he was going to die, and started clicking the trigger, following which the inmate was kicked and beaten. On some nights a group of guards visited the cell area and threatened inmates with death, pointing guns or sticks into cells. Several of the witnesses had personally complained to members of the Goldman Panel and to public figures visiting Attica (e. g., Congressman Rangel, Senator Dunne and Assemblyman Eve).

On October 6, 1971, Judge Curtin denied plaintiffs' application for preliminary injunctive relief and dismissed their complaint insofar as it sought permanent relief and permission to maintain the suit as a class action pursuant to Rule 23, F.R.Civ.P. He accepted as true for the purposes of his findings the testimony given with respect to physical abuse and harassment of prisoners. He found that although racial slurs, nighttime harassment, threats and other improper conduct had continued, there was almost no evidence of physical abuse or brutality after September 14, and that Superintendent Mancusi and others in charge had not countenanced physical abuses or threats on the part of their subordinates. He accepted Mancusi's testimony that inmates' private property would be safeguarded and returned,[6] and concluded that in view of the steps being taken to protect the inmates' constitutional rights and personal belongings and the absence of evidence of continuation of physical abuse, preliminary injunctive relief should not be granted. He further decided that no purpose would be served by permitting the suit to be prosecuted as a class action since individual inmates would not be precluded from seeking individual relief or damages.[7]

6. Plaintiffs have not taken issue on this appeal with the district court's further findings and denial of preliminary relief with respect to destruction of their property, probably because of the inconclusiveness of the evidence and the fact that since the destruction had already occurred and is unlikely to recur, equitable relief would be ineffective. One inmate, William Jackson, testified that on September 14–15 he participated in the clean-up of the debris resulting from the riot, filling wheelbarrows with inmates' belongings that were then scooped onto a dump truck and carted away. According to Jackson the belongings included eye glasses, legal books and papers, tooth brushes and hobby materials, all of which were in "perfect" condition and had not suffered any water damage. On the other hand, Superintendent Mancusi testified that after the quelling of the riot the premises were littered with property that was water soaked and contaminated with gas. The damaged property was piled up and moved out in the course of the clean-

up. Instructions were given to preserve prisoners' undamaged property as far as possible, returning it to the original owners. He did not know of any destruction of usable property. He further testified that steps were being taken to replace or restore eye glasses and dentures. For the most part his testimony is confirmed by the Goldman Panel, which was instrumental in sorting, bagging and returning property to prisoner-owners who had been relocated elsewhere when certain cell blocks became uninhabitable because of the riot.

7. On October 8, 1971, we heard an appeal from Judge Curtin's order entered September 28, 1971, denying preliminary injunctive relief against interrogation of inmates without counsel, which had been made the subject of a separate judgment pursuant to Rule 54(b), F.R.Civ.P. When plaintiffs later appealed from his orders dated October 6 and 7, 1971, both appeals were consolidated and heard on November 5, 1971.

### Discussion

■ In this action state prisoners convicted by state courts for violation of state laws seek federal equitable relief against state officials with respect to conditions arising out of a riot in a state prison. We are asked to intervene under 42 U.S.C. § 1983 on the theory that defendants' conduct violated plaintiffs' federal civil rights, even though conditions in state institutions are peculiarly a matter of state concern. However, whatever question some may have as to the wisdom of federal judicial intervention in delicate and complex problems of prison administration, this case, which involves specific claims of continuing cruel and inhuman physical abuse of inmates, is extraordinary and exceptional. Furthermore the question of whether exhaustion of state judicial remedies should be required in similar prisoners' suits under 42 U.S.C. § 1983 is presently *sub judice* before this court sitting *en banc* in Rodriguez v. McGinnis, et al., 451 F.2d 730 (2d Cir. 1971); United States ex rel. Katzoff v. McGinnis, et al., 441 F.2d 558 (2d Cir. 1971); and United States ex rel. Kritsky v. McGinnis, et al., Dkt. #35253 (on appeal from decision of N.D.N.Y., 313 F.Supp. 1247). Accordingly we proceed to the merits.

The tragic events at Attica have deeply affected vital interests not only of those directly involved, including inmates and correctional personnel, but of the public at large. The public wants to know the facts, with a view to preventing the recurrence of conditions that led to the uprising. Public investigations have already been instituted for the purpose of determining whether the prison conditions that existed at Attica before the uprising were inhumane or intolerable, whether the concept and conditions of maximum security are necessary, and whether the restriction of prisoners to life in cramped cells, isolated from the outside world, is so dehumanizing and oppressive that it should be modified in some respects.[8]

■■ In the meantime the State has the duty to investigate and prosecute all persons, including inmates, who may have engaged in criminal conduct before, during and after the uprising. In such an investigation each inmate is entitled to protection of his constitutional rights, subject to such restrictions as are reasonably and necessarily required in light of his incarceration pursuant to his prior conviction on other charges.

■■ In seeking preliminary injunctive relief plaintiffs assumed the burden of showing probable success on the merits and some irreparable injury or, where the showing of probable success is uncertain, that the balance of hardships tips decidedly in their favor. Clairol Inc. v. Gillette Co., 389 F.2d 264 (2d Cir. 1968); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969). Here the record discloses a complete failure to sustain the burden with respect to their claim that they may be interrogated in disregard of their federal constitutional rights.

There is no substantial evidence of any improper questioning of prisoners. On the contrary, the record reveals a conscientious effort on the part of responsible public officials to respect inmates' rights to remain silent if they choose, or to refuse to speak without prior consultation with or in the the presence of their own legal counsel. Superintendent Mancusi has prohibited any interrogation by prison personnel and there is no evidence of any such interrogation since the single event on September 13 testified to by Colvin. Numerous competent and qualified lawyers, including members of the Legal Aid Society, NAACP Legal & Educational Fund, National Lawyers Guild, American Civil Liberties Union, Center for Constitutional Law, and National

---

8. On September 30, 1971, a committee of five state court judges, headed by Chief Judge Stanley H. Fuld, acting at the request of Governor Rockefeller, named a nine-member citizens committee, of which Robert B. McKay, Dean of New York University Law School, is Chairman, to conduct a full and impartial investigation of all aspects of the Attica prison uprising.

Conference of Black Lawyers, have rallied to the inmates' support, conducting scores of attorney-client interviews, and taking such other steps as they consider advisable to protect the inmates' constitutional rights. In addition, members of the Goldman Panel have enlisted the support of the New York State Bar Association and of the Fourth Judicial Department to supplement the efforts of local county bar associations in providing sufficient qualified counsel to avoid conflicts of interest that might otherwise develop.

Members of the Attorney General's staff are acutely aware of the necessity for careful observance of the constitutional rights of inmates questioned by them, including the necessity for giving *Miranda* warnings to those suspected of having committed criminal acts. Indeed the State has a strong interest in insuring that the appropriate warning will be given to any inmates who are the targets of suspicion, since any evidence obtained from them in violation of their constitutional rights would be suppressed upon subsequent prosecution of them. Miranda v. Arizona, 384 U.S. 436, 476, 86 S.Ct. 1602 (1966).

█ In any event, equitable relief is not warranted for the further reason that if a statement should be obtained from an inmate in violation of his constitutional rights, he has an adequate remedy at law by way of a motion to suppress in the proceeding in which the State seeks to use it. People v. Paulin, 25 N.Y.2d 445, 450, 306 N.Y.S.2d 929, 933 (1969). We may anticipate, in view of the wide public concern about Attica, that in the event of any later prosecutions in which an inmate's statements were offered or used, the circumstances surrounding the obtaining of such evidence would be thoroughly scrutinized. Well aware of these risks, members of the Attorney General's staff have assured us in open court that they propose to proceed most cautiously. This representation has since been confirmed by the Report of the Goldman Panel, which states that Deputy Attorney General Fischer advised that "he was issuing written instructions ordering *Miranda* warnings in every case" (p. 14).

█ Notwithstanding these assurances plaintiffs ask for an injunction against any interrogation of inmates unless it is conducted in the presence of the inmate's counsel or the inmate has first been advised by legal counsel. Such an order, however, would go beyond what is necessary for the protection of the rights of the inmates here, since they have been advised of their right to legal counsel and have been offered the services of numerous qualified lawyers, of which many inmates have availed themselves. The record reveals, for instance, that of the 8 named plaintiffs, 6 have talked with an attorney at least 5 times, Roger Champen having had 11 visits by lawyers and Herbert Blyden 15. Under the circumstances, including the fact that the great majority of inmates have already been represented by legal counsel in prior proceedings,[9] there is no substantial risk that any inmate has not been advised of his right to counsel or that he will fail to request counsel if he wishes the presence of a lawyer at his interrogation.

The order requested by appellants would also, by forcing the appointment of legal counsel upon interrogees who may not wish such representation, go beyond any step heretofore deemed re-

9. For instance, Herbert X. Blyden, presently serving a 15 to 20 year sentence upon his plea of guilty to armed robbery, is under indictment as a leader of an uprising which occurred in the Manhattan House of Detention for Men (Tombs) in October, 1970. See also Blyden v. Hogan, 320 F.Supp. 513 (S.D.N.Y.1970), in which he is a named plaintiff in a class suit on behalf of Tombs prisoners pursuant to 42 U.S.C. § 1983 attacking the New York County District Attorney's use of a waiver form which prisoners were requested to sign, consenting to be interviewed with or without the presence of counsel, on the ground that prisoners have the constitutional right to the advice of counsel at or before they are asked to sign the waiver.

quired for the protection of a citizen's Sixth Amendment rights, including those prescribed by the Supreme Court in *Miranda, supra,* and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). If the same logic were applied generally, it would prohibit any law enforcement official from interrogating anyone in a pending criminal investigation without a lawyer's first having been retained or appointed to consult with the prospective witness. In our view such a step is unwarranted. Furthermore, where a request is made of a federal court with respect to witnesses being interrogated in a state criminal investigation, as is the case here (a Grand Jury having been convened in Wyoming County), we can find no precedent supporting federal intervention which, in addition to its obvious potential for exacerbating federal-state relations, might constitute an unwarranted intrusion upon the pending state criminal proceeding. *Cf.* Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

■ Plaintiffs urge that an exception to these well-established principles is warranted in the case of interrogation of inmates of a prison, since they are "in custody" and their failure to furnish information in response to inquiries by state representatives may result in administrative reprisals in the form of denial of parole eligibility, loss of good time, or denial of other privileges within Attica. Plaintiffs' incarceration as the result of prior convictions for unrelated offenses, while it does not strip them of Sixth Amendment rights, see Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed. 2d 381 (1967), does not confer upon them greater rights to counsel than those of citizens outside of the prison walls.

Their speculation that they might be subject to administrative reprisals for remaining silent or for refusing to cooperate with interrogators is not only unsupported but it is refuted by the record evidence. No inmates have been denied parole, "good time" or other privileges because of their refusal to talk when interrogated. Since correctional authorities play no part in the interrogation, which is being conducted solely by Deputy Attorney General Fischer's staff, there is little likelihood that the Attica staff is even aware of the identity of inmates who have refused to talk. Superintendent Mancusi has disclaimed under oath any disciplinary action based on such reprisal.[10] Furthermore, when it appeared that some prisoners might be denied parole because of administrative charges, the Goldman Panel notified the Board of Parole, which ordered their release. See Goldman Panel Report, p. 15. No basis is shown, therefore, for mandatory appointment of counsel at this stage because of the risk of administrative reprisals. Denial of plaintiffs' application is, of course, without prejudice to their due process rights in any disciplinary proceeding that might be instituted against them. See Sostre v. McGinnis, 442 F.2d 178, 194–199 (2d Cir. 1971) (*en banc*); Carothers v. Follette, 314 F.Supp. 1014, 1028–1029 (S.D.N.Y.1970).

■ When it comes to the risk of future physical abuse and harassment of inmates, the picture is somewhat different. The barbarous conduct testified to by various witnesses and taken as true by Judge Curtin for the purposes of his interlocutory decision—the beatings, physical abuse, torture, running of gauntlets, and similar cruelty—was wholly beyond any force needed to maintain order. It far exceeded what our society will tolerate on the part of officers of the law in custody of defenseless prisoners. Although lawful incarceration, as it

10. Although approximately 60 prisoners believed to have been ringleaders in the uprising have been placed in a separate housing facility known as the HBZ section, it is a modern cell block with cells of standard size and the usual bed, wash bowl and toilet, with shower bath stalls in the section, and their segregation there has nothing to do with their refusal to cooperate in the Attorney General's interrogation of them. See Goldman Panel Report, p. 28.

has often been said, deprives the prisoners of many rights enjoyed by others (*e. g.*, travel, choice of occupation, privacy, and association with others), Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), they are still entitled to protection against cruel and unusual punishment by the Eighth Amendment. Corporal punishment of prisoners has been disapproved of by penologists except where "necessary to protect one's self or others from injury, or to prevent escape, or serious injury to property." American Correctional Association, Manual of Correctional Standards (1966), p. 417, as quoted in Landman v. Royster, 333 F.Supp. 621 (E.D. Va.1971). But even if some corporal punishment may be permitted under the Constitution, the mistreatment of the inmates in this case amounted to cruel and unusual punishment in violation of their Eighth Amendment rights, Wilkerson v. Utah, 99 U.S. 130, 136, 25 L.Ed. 345 (1878); Wright v. McMann, 387 F.2d 519, 525 (2d Cir. 1967); Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968) (Per Blackmun, C. J.); Sostre v. McGinnis, 442 F.2d 178, 191 (2d Cir. 1971) (*en banc*), which may be enjoined where there is "danger of recurrent violation," United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

■ If the abusive conduct of the prison guards had represented a single or short-lived incident, unlikely to recur, or if other corrective measures had been taken to guarantee against repetition, injunctive relief might be denied, despite the heinous character of the conduct. See Belknap v. Leary, 427 F.2d 496 (2d Cir. 1970). Here, however, the conduct of some of the prison guards, state police and correctional personnel, *as* testified to, was not only brutal but it extended over a period of at least several days, with one serious incident occurring much later, i. e., the surreptitious lining up and striking of inmates by prison guards in A Block on September 22 as testified to by Jackson (R. pp. 250–51). In addition there was extensive testimony regarding night-time harassment, threats,

racial slurs and similar misconduct by prison personnel, which was found by Judge Curtin to be continuing at the time of his decision on October 6. His conclusions have since been confirmed by the Goldman Panel, which reported on November 18, 1971, that it had received complaints regarding continued harassment. It concluded "The danger of harassment of inmates continues, however, and the likelihood of unjust retaliatory and inflammatory acts in parole and other areas still remains." Goldman Panel Report, pp. 20–22, 36. Clarence B. Jones, a member of that panel, testified that the atmosphere in Attica continues to be one of "controlled hostility" between guards and inmates (R. p. 196).

It is true that some steps have been taken to insure against recurrence of such conduct on the part of correctional officers. For instance, three state monitors have been appointed, and on October 5, 1971, the Governor requested assistance from the United States Department of Justice, to which the Attorney General of the United States responded on October 19 by stating that he had ordered the Civil Rights Division to investigate prisoners' complaints of beatings and harassment. Although all of these measures are salutary, they appear to be insufficient to assure against repetition of the misconduct. The three monitors, for instance, are present at Attica only during day-time hours and hence cannot observe any night-time harassment, which has been repeatedly alleged. As for the suggestion of help from the Civil Rights Division we are not advised that any steps have been taken to implement the Attorney General's direction other than to dispatch agents of the Federal Bureau of Investigation to interview some of the prisoners.

In the last analysis the situation here is unique in that plaintiffs, being prisoners, are at the mercy of their keepers, many of whom, on the testimony below, have already subjected inmates to barbarous abuse and mistreatment. The major wave of guards' reprisals has probably passed. On the record before us, however, the district court was not

justified in assuming, without further proof, that adequate steps would be taken to protect the inmates against further reprisals, perhaps of a more sophisticated and subtle nature. Under the circumstances preliminary injunctive relief should have been granted against further physical abuse, tortures, beatings, or similar conduct. The grant of such preliminary relief, of course, should be without prejudice to the defendants' right to offer evidence in support of an application to vacate the injunction upon. showing that adequate steps have been taken to protect the inmates against recurrence.

We also reverse the district court's dismissal of the complaint insofar as it seeks permanent injunctive relief against violation of the inmates' Eighth Amendment rights. The allegations of the complaint, which must be considered in the light most favorable to the plaintiffs upon a motion to dismiss, Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Wright v. McMann, 387 F.2d 519, 521 n. 3 (2d Cir. 1967); Church v. Hegstrom, 416 F.2d 449, 450 (2d Cir. 1969); Build of Buffalo, Inc. v. Sedita, 441 F.2d 284, 287 (2d Cir. 1971), clearly state a claim entitling them to some injunctive relief if proved at trial by a fair preponderance of the evidence. The evidence presented to the district court was received solely upon plaintiffs' application for preliminary relief without any consolidation of that hearing with a trial on the merits pursuant to Rule 65(a) (2), F.R.Civ.P. Accordingly plaintiffs are not precluded from presenting additional evidence at trial. Capital City Gas Co. v. Phillips Petroleum Co., 373 F.2d 128, 131 (2d Cir. 1967).

In regard to the counsel claim, we affirm the district court's denial of plaintiffs' application to maintain the suit as a class action. As to that issue, plaintiffs have failed to satisfy certain essential requirements prescribed by Rule 23, F.R.Civ.P., as conditions precedent to the prosecution of a lawsuit as a class suit. Although plaintiffs present some common questions of law and fact, it is by no means clear that their claims are typical or representative of all members of the purported class, i. e., the inmates of Attica, or that they will adequately protect the interests of all inmates. On the contrary, sharp conflicts of interest exist between inmates. Some did not participate at all in the uprising, while others did. Some may be threatened with state prosecution, while others will not. Some, therefore, may be called upon to testify with respect to criminal acts committed by others, and may even desire to do so, while others may desire the opposite.

As to the prayer for injunctive relief against brutality or the threat of it, however, we find that a class action is properly maintainable. The proposed class comprising the inmates of Attica is sufficiently numerous to make joinder impracticable, all inmates have a common interest in preventing the recurrence of the objectionable conduct, the claims of the representatives of the proposed class are typical of those of all the inmates, and an injunction against brutality would fairly and adequately protect the interests of all the inmates. Rule 23(a), F.R. Civ.P. Furthermore, representatives of the State have acted or have failed to act on grounds generally applicable to the class, making injunctive relief appropriate with respect to the class as a whole,[11] Rule 23(b) (2), F.R.Civ.P. Therefore, the order of the district court

11. "Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." F.R.Civ.P., 23, Advisory Comm. Note, 39 F.R.D. 95, 102 (1966).
See Holt v. Sarver, 309 F.Supp. 362, 372–73 (E.D.Ark.1970); Valvano v. McGrath, 325 F.Supp. 408, 412 (E.D.N.Y. 1971); see also Jackson v. Bishop, 404 F.2d 571, 573 (8th Cir. 1968).

denying appellants' application to maintain the suit as a class action as to the brutality issue is reversed.

### Conclusion

The orders of the district court are reversed insofar as they dismissed plaintiffs' complaint and denied injunctive relief restraining defendants, their agents and employees, including state police, guards and correctional personnel, from subjecting Attica inmates to physical abuse, torture, beatings or other forms of brutality, or threatening such conduct, and insofar as they denied plaintiffs' application to proceed with the brutality claim as a class action. The district court is directed to enter a preliminary injunction against such conduct and to consider any more specific measures that might be ordered to implement the injunction, including the appointment of federal monitors to serve at Attica. The injunction may be vacated upon a showing that it is no longer required for the protection of the inmates.

In all other respects the decision and orders of the district court are affirmed.

LUMBARD, Circuit Judge (concurring):

While I agree in all respects with Judge Mansfield's opinion, I believe some comment is in order regarding Judge Oakes's view that the district court should hold a hearing and make findings regarding whether counsel ought to be provided for all prisoners prior to interrogation even if no request for counsel has been made.

Only the real probability of continued physical abuse or harassment can justify the issuance of an injunction by a federal court to forbid and prevent such illegal conduct. An entirely different kind of question is presented with respect to how the state is to conduct its investigation of the killing of 32 inmates and 11 guards and the injuries suffered by scores of others. It is quite apparent that the Governor, the Commissioner of Corrections and the Special Deputy Attorney General are well aware of the difficulties and requirements of such an investigation and any prosecution which may result therefrom.

Neither Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), nor any other decision of the Supreme Court, or of this court, holds that the state must conduct its investigation in any particular way or that certain warnings must be given to any or all persons who may be interrogated by those investigating crimes which were or may have been committed at Attica. All that Miranda holds is that a defendant's statement may not be used against him in a criminal prosecution or otherwise unless he has first been given certain warnings and he has knowingly elected to speak with or without advice of counsel. A conviction will not stand if it has been obtained through the use at trial of a statement made by a defendant who has not been warned substantially as Miranda specifies. Miranda is a rule of evidence.

For whatever reasons the state may find sufficient, the state may well elect to give Miranda warnings to some and not to others. Any investigation must rely on witnesses and the investigators must make a choice as to who would better serve as a witness and who might be a defendant. Obviously only a minority of prisoners can be defendants and those examined as witnesses will far outnumber those who ultimately become defendants.

An injunction applicable to every prisoner who might be questioned not only would go far beyond the proper province of a federal court, but would seriously impede the investigation which ought to move forward with all the speed the state can summon.

If and when a claim is made by a prisoner that the state is using against him a statement made by him, without his being given the Miranda warning, it will then be time for the appropriate state tribunal to adjudicate that claim in the usual way, with the United States Supreme Court as the ultimate court of appeal.

No prisoner has any right to have a federal court determine under what circumstances, and with or without what warnings, he is to be questioned by state officers and under what circumstances he must not be questioned at all. It is enough that a failure to observe the *Miranda* teachings carries the sanction of invalidating any use, except for purposes of impeachment, by the state of a prisoner's statement obtained contrary to the *Miranda* mandate.

OAKES, Circuit Judge (concurring in part and dissenting in part):

I concur in so much of the opinion and order as relates to brutality and abuse of the Attica inmates. I dissent as to so much of it as concerns the right to counsel, but on a limited basis.

The Legal Aid Society has on final argument narrowed its request for relief in this proceeding—in order to avoid possible conflicts of interest—from the full right to counsel for each inmate sought at the first argument before this court, to the right of each inmate to consult with counsel from the Legal Aid Society as to whether he should consult with an attorney to be appointed by the appropriate state court before or in connection with interrogation by state officials. Since a number of inmates have returned the state's forms of Notice (quoted in note 5 of the majority opinion) either blank or with merely a signature and no signification as to whether they want counsel, or not returned the forms at all, it seems to me plain that many inmates have at the very least been inhibited from communicating their true wishes to the state officials. Such inhibition may have been based not only on the harassment and abuse now enjoined, which occurred after the tragic events of the prison riot, but also on the inmates' fear of future disciplinary re-

prisal or effects upon parole, as mentioned in the Goldman Panel Report (pages 20–22, 36) quoted in the majority opinion. *See* Clutchette v. Procunier, 328 F. Supp. 767 (N.D.Cal.1971).

The often arbitrary deprivation of "good time" credits that has taken place in the New York prison system in the past[1] obviously may have an inhibitory effect upon the voluntariness of any choice to seek or not to seek counsel. Thus this is not a case where the remedy of relief by suppression of illegally obtained statements would be sufficient, as the trial judge supposed; it may be that inmates who were unwilling participants in the riot have not wanted to signify that they want counsel out of fear of reprisal from prison officials in one of several ways, including prison disciplinary proceedings, other than criminal prosecution. A given inmate may be on the horns of an insoluble dilemma—if he doesn't talk he runs a risk of prison discipline; if he does, he runs a risk of prosecution. *See* Clutchette v. Procunier, *supra.* Thus his need for counsel may exceed that of a person in the usual criminal interrogation.

Nor is this a case in which it is sought to enjoin a state criminal prosecution as in Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L.Ed.2d 669 (1971). Here the narrow relief now sought is a consultation to determine whether an inmate who by definition is in custody[2] should exercise his right, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758 (1964), to consult counsel before being subjected to interrogation by state officials contemplating prosecution. To grant such relief has considerable precedent. *See* Lewis v. Kugler, 446 F.2d 1343 (3rd Cir. 1971); Gomez v. Layton, 129 U.S.App.D.C. 289, 394 F.2d 764, 767 (1968); Lankford v. Gelston, 364 F.2d

1. Sostre v. McGinnis, 442 F.2d 178 (1971); Wright v. McMann, 387 F.2d 519 (2d Cir. 1967); United States ex rel. Katzoff v. McGinnis, Docket No. ——— (N.D.N.Y. Aug. 18, 1970), Kritsky v. McGinnis, 313 F.Supp. 1247 (N.D.

N.Y.1970), United States ex rel. Rodriguez v. McGinnis, 307 F.Supp. 627 (N.D.N.Y.1969) (pending en banc).

2. Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

197 (4th Cir. 1966). *Cf.* Terry v. Ohio, 392 U.S. 1, 14–15, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968).

Thus I take the view that it was error to dismiss the claim for permanent relief on the ground that ample remedies from unconstitutional interrogation lie by way of further evidentiary suppression. This is especially true, I think, in light of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which seems to hold that an involuntary confession may be used in impeachment. Since the trial judge's thinking to the contrary also plainly affected his denial of preliminary relief, I would reverse his order in that respect and remand for findings. In view of the trial judge's record of prompt and expeditious handling of court business, any suggestion that the hearings on the application for preliminary and permanent relief should be combined and held promptly would be superfluous. I believe that for the foregoing limited purposes (brutality and right to counsel) this action should properly be treated as a class action. Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968).