**Essex RAY, also known as Dim Mak et al., Plaintiffs,**

v.

**Nelson A. ROCKEFELLER, Governor of the State of New York, et al., Defendants.**

**No. 71–CV–488.**

United States District Court, N. D. New York.

Jan. 11, 1973.

William E. Hellerstein, Richard A. Greenberg, William A. Nelson, The Legal Aid Society Prisoners' Rights Project, New York City, Jethro M. Eisenstein, New York University Law School, New York City, of counsel, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of State of New York, Albany, N. Y., Timothy F. O'Brien, Jack W. Hoffman, Asst. Attys. Gen., for defendants.

## MEMORANDUM-DECISION and ORDER

JAMES T. FOLEY, District Judge.

The above-named plaintiffs are State prisoners confined in the Clinton Correctional Facility located at Dannemora, New York after their convictions of varied criminal violations of New York criminal laws. The complaint was filed November 15, 1971, and was prepared in its form and content by the Prisoners' Rights Project lawyers of the New York City Legal Aid Society. I do not know the time this special group was formed but it is my first contact with it after twenty-four years of steady contact with State prisoner applications from the substantial number of them confined in the three maximum security facilities located in this Northern District of New York. Jurisdiction is based upon the customary civil rights statutes that are invoked routinely and knowledgeably by the State prisoners themselves in their individual filing of numerous pro se civil rights claims. Such complaint procedures in recent years have become the popular one in filings by State prisoners for every imaginable type of grievance in the New York Federal District

Courts. (See Rodriguez v. McGinnis (in banc-2 Cir.), 456 F.2d 79, at 86 (Lumbard, C. J. dissenting). This present complaint differs from the continuous and numerous ones filed in that class action status is sought by its allegations. The grievances set forth in the complaint, in separate portions, cover the gamut of prisoner grievances that are very familiar to the Judges of this District Court and usually are confined to one or two when individually filed. In the complaint, Part IV, paragraph 15, Statement of Claim, which is followed by the allegation of the particularized conduct, allegedly violative of the Eighth and Fourteenth Amendment rights, states expressly that the particularized allegations that follow are *made upon information and belief*.

One specific in this lawyer class pleading that stands out and always tends, in my opinion, to portend a sense of exaggeration is the demand of One Million Five Hundred Thousand ($1,500,000.00) Dollars to be accorded the individual plaintiffs for compensatory and punitive damages. I am not sure whether that amount is the aggregate for all named plaintiffs or for each individually. It seems fair inference to assume that demands for these amounts of money must tend to exacerbate the tension recognized by those with any experience in previous suits between inmates and correction officers. As a matter of interest, it should be noted that Attorney Hellerstein stated in "Legal Notes and Viewpoints—Remedies in Prisoners' Rights Litigation, Practicing Law Institute Bulletin, Vol. 9, October 13, 1972, Issue—"6. A Note on Damages in Jail Suits: . . . However, the amount of recovery may be limited to compensatory damages, which in most cases will not be great . . .". The authority for this caution and the further discussion of strategy on damage requests in jail suits is Hellerstein & Shapiro, Prison Crisis Litigation, 21 Buff.L.Rev. 643, 655–656 (1972). Some support for amounts much below a million dollars in demands could be found in Wright v.

McMann (N.D.N.Y.), 321 F.Supp. 127, in which I awarded $1500.00 compensatory damages, and was affirmed in that regard as to sufficiency and inexcessiveness in (2 Cir.) 460 F.2d 126, cert. den. 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141, 1972.

Be that as it may, and it is of little importance, because the Judges of this District Court here always considered the prisoners civil rights claims conscientiously with full understanding that many of the extravagant damage amounts are those of lay persons untrained in the law and with no practical experience in litigation, and are asserted mostly for shock value against State and prison officials and correction officers. As noted above, the complaint was filed on November 15, 1971, and I allowed it to be done in forma pauperis and permitted the plaintiffs leave to proceed in forma pauperis in the prosecution of their action. It is unusual to do so, but it is important to discuss several events that transpired in my first contact with the legal aid lawyers from New York City that preceded the formal filing of the complaint in November 1971.

My office records show that on October 29, 1971, Attorneys Greenberg and Nelson came to my Chambers in Albany from the Legal Aid Society of New York City. Neither was admitted to practice in this District Court, and their presentation directly to me of an order to show cause and temporary restraining order was violative of an express order of this Court that such applications were to be filed in the Clerk's office at Utica. However, they painted such a picture of horrors, savagery and brutality going on at Special Housing Unit 14, at the Clinton Correctional Facility, I decided it important to hear them out immediately although frankly I sensed proneness on their part to believe without further check the stories of prison inmates who at times have a tendency to exaggerate. Special Housing Unit 14 was well known to me because it was the exact segregation unit that I learned about in detail from considerable testimony about its

make-up and cell conditions and wrote at length about in Wright v. McMann (N. D.N.Y.), 321 F.Supp. 127 (1970). In that decision (pp. 135–136) I noted that changes and improvements had taken place in this segregation building, and this finding was affirmed and vindicated in the opinion of Judge Lumbard which affirmed in the main my rulings below, and noted new statutes and rules of New York that corrected the treatment and living conditions that were unfortunately contrary to humane standards for prison confinement even in the segregation unit that may be maintained legally for internal administrative disciplinary purposes. (Wright v. McMann, 460 F.2d at p. 131). While in my Chambers, there were two or three telephone calls which I allowed in my presence to another Legal Aid lawyer, whom I believed was at the Clinton Correctional Facility itself. It turned out later, I believe, that it was Professor Eisenstein who was in a grill or restaurant near the prison and wanted to talk to me on the telephone about his problem of seeing inmates. I refused to talk to him on the telephone because that would be a new custom for servicing the problems of State prisoners and lawyers that I did not want to inaugurate. In accord with settled case law of the Court of Appeals, Second Circuit, I had the Attorney General's office notified of the application to be made for the extraordinary temporary relief. (Arvida Corporation v. Sugarman, 2 Cir., 259 F.2d 428; Austin v. Altman, 2 Cir., 332 F.2d 273, 275). My records show that after a hearing in Chambers from 3:30 p.m. to 5:10 p.m., I denied the temporary restraining order which was featured in my judgment by its extraordinary request to have the plaintiffs taken by the United States Marshals into federal custody or for me to select and direct federal monitors to be stationed continuously in Special Housing Unit 14. I did sign the order to show cause and made it returnable November 15, 1971, and refused to allow the proposed complaint offered at that time to be filed in forma pauperis. One of the reasons for this is the Clerk's office is at Utica, approximately 100 miles away, and it is his function to file and process the complaint and summonses.

At that time, I did notice that the lead plaintiff was Robert Kareem Clarke who was involved in hearings before Judge Port in March 1971, concerning the Auburn disturbances. I shall file extracts of those minutes of those hearings to indicate the attitude of the plaintiffs in the courtroom and anteroom that led Judge Port to discontinue the hearings. (Ct.Ex. 1.) Later, the lead plaintiff in the complaint was changed to Essex Ray, different from Clarke, and of course that created confusion in our record keeping. It must be kept in mind that October 29, 1971, was not long after the Attica tragedy of September 9, 1971. I was conscious by communications from the facilities throughout the District and the media that the prison system of New York was going through the worst of times, turbulent and dreadful, and undergoing intensive examination by high State officials who were working around the clock to restore order not only at Attica but throughout the entire correctional system. I was not inclined to intrude without better showing into the management of the State system in those precarious days. I realize that I had to rely on my own perception and judgment gained from years of experience in these matters, and there did not seem to be any reliable support for the lawyers charges and their assumptions of fierce on-going brutality by correction officers. At the time, the legal aid lawyers complained that the long ride from New York City fatigued them, and they when they arrived at Clinton, they had to wait an hour to see the inmates. Neither of these grievances impressed me because constitutionally I was concerned about cruel and unusual treatment of prisoners not lawyers.

A hearing was held in Albany before me commencing on February 22, 1972. It resulted in a record of 840 pages and due to the delay in the tran-

scription of minutes, I have read through again every page of this record. It is fascinating reading as always, and I recommend it to the several Commissions, Bar Associations and Courts, State and Federal, who are interested and concerned about the answers to be sought in the desired goal of true and balanced prison reform—with equal consideration given to the correction officer side as well as that of the prisoner. The task at hand for me is only to search the four corners of this record to ascertain whether or not the plaintiffs should be granted the preliminary injunction they seek and the class action status sought in the prosecution of the action. My answers after a careful review of the record are in the negative.

The complaint is a conglomeration of scattergun allegations. Many of its allegations as to different grievances were discredited by their own witnesses called by the legal aid lawyers for the plaintiffs at the hearing. The first witness was a newspaper man, and his testimony and article are a prime example of unsubstantiated conclusions and erroneous reporting in the Press. (Def.Ex A–R 19–72). There was attempt at the hearing, and in the preliminary stages of pleading and injunctive application, to gloss over the important fact that the correction officers were confronted with an incipient riot in the Special Housing Unit on the night of June 25, 1971. Such facts established in this record that on that night 14 cells were broken up, the toilets and sinks and pipes ripped out, mattresses burned, and so forth. This description of vandalism and confrontation, obviously planned, is portrayed vividly in the testimony of certain of the correction officers. CO Maloney who was on the scene testified he was told with obscene words to call his Lieutenant and to tell him "We are going to blow . . ." and then heard the words "code 1000 and all hell broke loose". (R 540). One of the greatest understatements I have ever read is that one contained in the Legal Aid brief at page 13 that these incidents "left a lega-

cy of ill-will". That is believable inasmuch as this intentional destruction was of a segregation unit about which there is undisputed testimony in this record that New York State spent a quarter of a million dollars to renovate and modernize it for humane living conditions. The considerable damage is evidenced by photographs received in evidence at the hearing. (Eleven photos—Def.Ex E—one photo—Ex F). These photographs are real evidence of the destruction that cannot be talked away by anyone.

Throughout this record, and I do not have the time to refer to each supporting page, there is no support at all for the general allegations, described as questions of common fact, that inmates of Special Housing Unit 14 are confined to strip cells, without functioning sinks or toilets; cells are filthy; plaintiffs are beaten and gassed indiscriminately; access to courts unlawfully impeded; rights to medical care and religious freedom are denied; and inmates are sentenced to Unit 14 in violation of constitutional rights. From the first witness called, in my opinion, there is not only a failure of reliable support for preliminary injunction, but direct and serious contradictions of many of the claims made in behalf of the plaintiffs. Outside of the newspapermen who had short inspection tours and experienced and were upset by an institutional smell and that of excrement, the important witnesses of course were Clarke and Shelby who actually were inmates of Unit 14 during the periods relevant to the issues here. They were advised to rely on the Fifth Amendment when asked about the destruction of their cells, and I as a Judge of course respect that right, but in a request for a preliminary injunction there is little illumination by this attitude about circumstances that might explain the heavy smell concern.

Clarke and Shelby in their testimony verify daily doctor visits and one of them admitted he kept his cell very clean. (R 442). I find that contrary to claims otherwise as they testified, they never had to sleep on the floor but had

mattresses supplied them even after they, themselves, broke up the beds and the correction officers admittedly removed the beds—being apprehensive of their conduct and were afraid they would use bed springs as weapons. From the picture easily gleaned from this overall record, I find in each instance the use of force, mace and tear gas justifiable and not excessive. Such use was compelled by circumstances brought about by a continuous threatening and contemptuous attitude with eagerness of these inmates to break down and disrupt authority and regulations. I find it beyond belief that with all the Commissions and legislative and prosecutive investigations with New York's highest correction officials deeply concerned that the brutal beatings alleged by the plaintiffs could take place. There is no reliable evidence offered to support the claims in that regard, and in fact the medical records and examinations regularly made and having an integrity of their own discount any serious injuries sustained by these named plaintiffs after the described assaults by correction officers. These medical reports to the contrary show physical injury to the correction officers and in July 1971, Essex Ray broke a bone in the neck of a CO with a Karate chop. I find as a fact reliable evidence from the regularity of log books in which regular entries were made when there were scuffles, and mace and tear gas had to be used, that in each instance the plaintiffs do not meet the burden imposed upon them by law and prove such use was not warranted. I find the supply of tear gas and mace properly stored and subject to supervision of its use and reporting to officers in higher grades than the ordinary correction officers. I find that these officers were subject to a continuous daily assault of the vilest type language, not only filled with threats to them but also to their families, and that they restrained themselves from provocation as much as is humanly possible, and were so instructed and trained by their superiors. (R 340—Def. Ex K).

It is no wonder Correction Officer Maloney, regularly in this Unit and never accused of any beating by Shelby and Clarke testified: "This language is standard procedure . . . and it really gets you . . . I am lining up another job right now . . . I have had it". There is also in this record made in February 1972 that TV, lawyers, and local press had free and open access to the Facility and held interviews with Inmates of Unit 14. (R 537). I find that these inmates were and are allowed to smoke, have commissary privileges, and are tendered a list of 400–500 books to select from. (R 573). It is in this record that the cells in segregation are larger in size than those in the general population. I find Unit 14 Inmates are served hot meals with correction officers using plastic gloves, and were so treated before and after the June 25, 1971, disturbance. (R 483). I find that it is significant that two Assemblymen, Olivieri and Van Roth, who visited the Unit never testified nor did the mother of Ralph Mercado who was there visiting him the day he claims grievous beatings. It is true there was a delay in report of Mercado's incident and he later had a tooth, allegedly broken, extracted. I find the inmates of Unit 14 no longer have to stand at door of cell when CO's come around. (R 270). I find that the use of hospital 5-gallon pails for toilet purposes in the cells was caused solely and proximately by the destruction of the toilets and sinks by the fourteen inmates in the cells, and that the use of these containers was conducted in a sanitary manner. I find that at times, and particularly during the summer, these inmates yelled and screamed to such extent that it could be heard in the village —and such shouting was usually to upset prison administration. I find that the show of clubs and helmets when these inmates were taken out during those days of tension to the showers or disciplinary hearings that they were warranted in the interests of self-protection by guards dealing with men who showed deliberate intent to cause trouble

and break down and put fear in the correction officer personnel in the enforcement of their obligation by law, and employment, to maintain order and impose discipline in accord with the rules and regulations of correctional authority. I find that the use of belts and handcuffs and rectal search before seeing legal or other visitors are decisions that are solely within the province of prison management and care in troubled days when insurrection might happen at any moment. I find the inmates of Unit 14 were given an opportunity to shower weekly and obtain a change of clothing.

I find comparisons attempted to be made with the situation described by Judge Mansfield in Inmates of Attica Correctional Facility v. Rockefeller, 2 Cir., 453 F.2d 12, cert. den. 404 U.S. 809, 92 S.Ct. 35, 30 L.Ed.2d 40, like trying to compare night and day. There is no orgy of brutality shown here, or testimony of any validity about bloody or wounded inmates as described there. Judge Mansfield was careful to indicate that the Attica Inmates case was extraordinary and exceptional and warranted the grant of federal equitable relief. In a recent decision, United States ex rel. Walker et al. v. Mancusi, 2 Cir., 467 F.2d 51, decided September 20, 1972, Judge Mansfield demonstrated the restraint federal courts must exercise in these situations unless there is violation of federal constitutional rights by stating that prison authorities must of necessity be allowed wide discretion in the use of protective confinement for the purpose of protecting the safety and security of the prison and its general population. Judge Kaufman reminded the federal court judges that we, trained as judges, lack expertise in prison administration and we do not qualify *as a federal* court to command state officials to shun a policy that they have decided is suitable because to the federal judge the choice may seem unsound or personally repugnant. (Sostre v. McGinnis, 2 Cir., 442 F.2d 178, 191; see also Wright v. McMann, 460 F.2d 126, at p. 131.)

There are satisfactory and settled guidelines established by case law to determine the grant or denial of preliminary injunction. Those seeking the preliminary injunction have the burden of convincing the court with reasonable certainty that they will prevail at the final hearing. (Checker Motors Corporation v. Chrysler Corporation, 2 Cir., 405 F.2d 319, 324; Clairol, Incorporated v. Gillette Company, 2 Cir., 389 F.2d 264, 265.) In my judgment, this record is barren of sufficient proof to grant the preliminary injunctive relief. I appreciate that the plaintiffs' lawyers, and three of them participated at the hearing, complained continuously about disallowance of calling more inmates as witnesses, but I think I was more than liberal in permitting testimony that covered claims of other inmate plaintiffs. There is discretion in that regard and I also had to think of the interest of security and safety of this Federal Building and its personnel. (SEC v. Frank, 2 Cir., 388 F.2d 486, 490–491; Redac v. All-State Ins. Co., 2 Cir., 412 F.2d 1043). Everyone knows the unrest caused by Attica, and particularly so the inhabitants of the City of Albany where the hearings in this matter were held. Four blocks up State Street hill is the New York State Correctional Services Department, occupying a large space area in the Twin Towers, a new Albany sky scraper. This building at the time the lawyers were in my Chambers, in October, was under practically daily bomb threat and it had to be fully evacuated many times. I shall not check when it happened but a bomb did go off and destroyed a large portion of the Department's space and other parts of the Building. The Department was finally forced to give up its lease and move to the outer areas of the City for security. In any event, the number of witnesses that the plaintiffs' lawyers wanted to call simmered down, as shown in the record, to two. (See Silver v. Dunbar (S.D.Cal.), 264 F.Supp. 177, 180–181). Plaintiffs' lawyers expressly said they

did not want to call Essex Ray as a witness. (R 832).

There is also complaint by the legal aid lawyers that there was not more speed in decision of these preliminary motions after the four-day hearing. Such anxiety was not evident at the February hearing when I tried to hasten it because of the presence of other equally important trial business. Professor Eisenstein said that the evidence "He assumed would be taken piecemeal —some today—then put over for a period of time". (R 147). He would not stipulate as provided by F.R.Civ.P. 65(a)(2) to have the hearing considered as one for trial on the merits. It was stated by one of the legal aid lawyers at the time of the hearings in February 1971 that there have been no beatings reported to them for a month before. Recently, Assistant Attorney General O'Brien has submitted to this Court, and I believe to the Court of Appeals, Second Circuit, a list of the named plaintiffs in this action. The list states that all except Mercado are confined in other institutions, released to general population at Clinton, or finally discharged from prison confinement.

The application for class action status is denied. I denied such status in Wright v. McMann (N.D.N.Y.), 321 F. Supp. 127, 137, and cited the authorities I relied upon for such decision and stand upon those authorities again. The Wright-Mosher actions brought significant reforms in segregation confinement at Clinton and proves the lack of need for class action status to attain desired prison reform. I do not find common questions of fact because each of the claimed assaults is an isolated, individual incident, at different times, with different surrounding factual circumstances. The name group here is a limited one, numbering fourteen (14) or less out of a prison population of over fifteen hundred (1500), and can be identifiable as inmates who broke up everything in their cells and were continuously insubordinate and violated the rules and regulations of the Facility. There is no showing here of widespread continuous brutality or authorized corporal punishment as shown in Holt v. Sarver (E.D.Ark.), 309 F.Supp. 362; Jackson v. Bishop, 8 Cir., 404 F.2d 571. I am aware that in Inmates of Attica Correctional Facility et al. v. Rockefeller, Governor et al., 2 Cir., 453 F.2d 12, a class action was ruled properly maintainable on the brutality issue. However, I think the Inmates of Attica case is sui generis and again easily distinguishable in that regard from the facts of this case. In my judgment, if class actions are to be maintained freely in State prisoners suits, we will have more chaos and confusion in their record keeping and processing than now exists. It is evident to me from daily contact that individual filings will be continuously made despite the class action grant. Predominance of common questions and superiority of class action is not evident to my mind. (Green v. Wolf Corp., 2 Cir., 406 F.2d 291, 300–301). Possibility of success is an important factor to be weighed in authorization of a class action. (Dolgow v. Anderson (E.D.N.Y.), 53 F.R.D. 664). I believe we have only claimed individual torts and wrongs based upon circumstances unusually uncommon and unforeseeable with the problem of application to reach and identify other persons so situated. (See Dale v. Hahn, 2 Cir., 440 F.2d 633, 640; Heckart v. Pate (N.D. Ill.), 52 F.R.D. 224). If the plaintiffs named be so advised, the actions will be treated as proper individual ones. (Carroll v. Assoc. Mus., etc. (S.D.N.Y.), 206 F.Supp. 462, 479.)

The motion of the plaintiffs for preliminary injunction and for permission for the action to proceed as a class action is denied, and the order to show cause with the lead plaintiff, Robert Kareem Clarke named, seeking such relief, is dismissed. In accord with F.R.Civ.P. 52(a), my findings for refusing the preliminary injunction are set forth herein.

I shall file all the exhibits, including Court Ex. 1, except the log books, with the Clerk of the Court at his Utica of-

fice, together with the entire transcript of testimony. The log books, Def.Exs. D, H, and I, shall be retained in my office for return to Assistant Attorney General O'Brien, and should be picked up promptly.

To anticipate, a notice of appeal from this decision, if forwarded to the Clerk's office at Utica, shall be filed without payment of the statutory fee. If such notice of appeal is filed, and I shall welcome it, I hereby certify the appeal is taken in good faith. (28 U.S.C. § 1915(a).

It is so ordered.