Raymond **GILLIARD** et al.,
**Plaintiffs-Appellees,**

v.

Russell **OSWALD**, Commissioner of Correctional Services, and J. Edwin LaVallee, Superintendent of Clinton Correctional Facility, Defendants-Appellants.

**No. 532, Docket 76–2109.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 3, 1977.

Decided March 16, 1977.

Rehearing En Banc Denied
June 17, 1977, see 557 F.2d 359.

Theodore H. Katz, New York City (William E. Hellerstein, Joel Berger and The Legal Aid Society, Prisoners' Rights Project, New York City, of counsel), for plaintiffs-appellees.

Joan P. Scannell, Deputy Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of State of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for defendants-appellants.

Before MOORE, OAKES and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

Defendants, Russell G. Oswald, Commissioner of Correctional Services and J. Edwin LaVallee, Superintendent of Clinton Correctional Facility (hereinafter "Clinton") appeal from a judgment in favor of plaintiffs, Raymond Gilliard, Francis Bloeth and John Suggs, inmates of Clinton at the time of the events herein described, awarding them $715, $748.25 and $740, respectively, as damages for their alleged "unconstitutional confinement in special housing units on and after February 23, 1973". (App. 9). The case was tried to the Court. Jurisdiction is premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

The theory upon which the District Court based its decision may be summarized in its finding that no emergency situation existed at Clinton on and after February 23, 1973 and that "[p]laintiffs' confinement in special housing units on and after February 23, 1973 constituted substantial deprivations and they were thus constitutionally entitled to minimal procedural due process." Conclusions of Law 2 and 3 (App. 8). Because we find no basis on the law and the facts for the judgment based thereon, we reverse for the reasons hereinafter stated.

The defendant LaVallee was the Superintendent at Clinton. As such, he was responsible for the welfare and safety of some 1600 inmates. Needless to say, this responsibility begat problems. These problems should not be analyzed in a legalistic way more than three years after the events in issue by judges who did not have to cope with the situation presented to the Superintendent at the time. Rather, if justice is to be accomplished, we must try to look through the Superintendent's eyes at what he saw and into his mind as to his reaction thereto.

Prior to February 15, 1973 there had been a series of assaults by inmates upon inmates which apparently culminated on February 15th with the serious injury of five of them, two of whom had to be hospitalized. Faced with this situation, the Superintendent declared a state of emergency, ordering that Clinton "be completely closed down, and that the entire inmate population be locked in their cells." Finding of Fact 3 (App. 4). This he was entitled to do "if necessary for the safety or security of the facility" and to direct that "all inmates or any segment of the inmates . . . be confined in their cells or rooms for the duration of any period in which the safety or security of the facili-

ty is in jeopardy."[1] Such procedure is known as "keeplocking".

Thereafter an intensive search was conducted, both of the inmates and of their cells, which search uncovered a large number of weapons and other contraband. Next, it became necessary to determine, if possible, those responsible for the assaults. This investigation was far more difficult and time consuming. The prison was divided into fourteen separate areas from which lists were obtained as to disruptive or potentially disruptive inmates. Appearances on one or more of the lists presented good cause for further investigation.

On February 23, 1973, to further the investigation and to allay the fears of other inmates, some 140 men, including the plaintiffs, were transferred to a Special Housing Unit referred to as the "E Block". Notice of the transfer was given to each of the inmates transferred, the substance of which was that he was being placed "in temporary keeplock status" because of the February 15, 1973 disturbance until his status was determined, and that the action was taken "for the safety and security of you, and the institution." (App. 23).

On March 12, 1973, while the investigation was continuing, plaintiffs and others were moved to a more restrictive area, known as "Unit 14", and on or about March 28, 1973, plaintiffs were transferred to the Adirondack Correctional Treatment and Evaluation Center. In early April a report was made that the emergency had ended. On May 22, 1973 plaintiffs commenced this action.

The District Court, in its Memorandum Decision and Order, stressed the facts that plaintiffs were not informed of any specific charges against them and that they were not given a hearing so as to challenge their confinement. With the court's finding that there was no continuing state of emergency from February 23, 1973 to late March, 1973, justifying plaintiffs' summary confinement in special housing units and the court's conclusion that the disciplinary action taken against the plaintiffs was in violation of their due process rights (App. 7, 9), we disagree.

At the outset, in our consideration of the law we must not be guided by the decisions of those courts which faced situations involving specific harsh treatment accorded to a particular inmate. In other words, we are not dealing with a *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir. 1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), type of case or with facts as presented in other and different cases. Nor should we be misled by the word "emergency" and endeavor to give it a talismanic meaning. Instead we should look to the actual situation which confronted the man charged with the responsibility of the safety of some 1600 inmates, a man possessed of years of practical experience in prison management, to decide whether his judgment in handling the situation then before him failed to comport with permissible standards.[2]

The Superintendent's actions were not called into play because of, or against, these three plaintiffs. A situation had arisen requiring a thorough investigation of the entire prison and its inmates. The three plaintiffs, even after their names appeared on several lists, were not singled out; they merely became part of some 140 inmates requiring further investigation. Segregation of these 140 might well have assisted and expedited that investigation. Furthermore, only by such a procedure could it be determined whether or not these plaintiffs were involved. Moreover, there has been

1. Section 251.6(f) of Title 7 of the Official Compilation of Codes, Rules and Regulations of the State of New York.

2. "The psychology and social stability of a prison community are foreign to one who is not involved with it on a day-to-day basis. Any attempt to reconstruct, at a later date, the conditions present at the time of dispute, and the dangers then feared by prison authorities, is fraught with perils of misunderstanding and misapprehension.

   Accordingly, the standard of review of a challenge to the sufficiency of the basis for emergency response must be generous to the administration." *LaBatt v. Twomey*, 513 F.2d 641, 647 (7th Cir. 1975) (an emergency keeplock situation).

no showing below of either malice or lack of good faith on the part of the Superintendent.

■ The District Court found that there was no continuing emergency after February 23, 1973, but the Court was not on the scene or responsible for the welfare of the inmates. An "emergency" of the type exhibited in Clinton in February 1973 cannot be measured with the timing of a stopwatch or have an automatic shut-off switch. It may well be that the immediate measures taken by the Superintendent caused the assaults to cease, but these visible signs would not necessarily evidence a cure of the cause or assure accurate identification of the troublemakers. Their ascertainment would necessitate time and subtle investigation because it is to be doubted that inmates would relish even the suspicion of being known as informants. The methods to be pursued had to be entrusted to the discretion and judgment of the Superintendent. His judgment should prevail absent a clear showing of gross abuse.

Moreover, a prompt return of these inmates to their original cellblocks might have resulted in a renewal of the very evil which the Superintendent was seeking to cure.

> "[T]he possibility of widespread violence is a continuous condition of prison life. A good faith determination that immediate action is necessary to forestall a riot outweighs the interest in accurate determination of individual culpability before taking precautionary steps. Indeed, even in many of the minor decisions that guards must make as problems suddenly confront them in their daily routines, the state's interest in maintaining disciplined order outweighs the individual's interest in perfect justice." *United States ex rel. Miller v. Twomey*, 479 F.2d 701, 717 (7th Cir. 1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974).

A hypothetical, but not fanciful, case might well have arisen had the Superintendent prematurely ended his investigation and an inmate been seriously injured as a result: The injured inmate could well have argued liability for failure to do the very acts which the Superintendent carried out here.[3]

■ Plaintiffs argue lack of a hearing. This argument overlooks the fact that at this stage the Superintendent's acts were entirely administrative and the proceedings purely investigatory. Even reducing the number of inmates potentially involved to a few hundred, a hearing for each would have been virtually impossible. And a hearing for what? The situation was not ripe for definite charges—and charges should not be made until facts justifying them are obtained.

The law in this Circuit is clear that under circumstances far less compelling than those now before us,

> "[p]rison authorities must of necessity be allowed wide discretion in the use of protective confinement for the purpose of protecting the safety and security of the prison and its general population [citing cases]." *United States ex rel. Walker v. Mancusi*, 467 F.2d 51, 53 (2d Cir. 1972).

■ In view of our conclusion that the record discloses no violation of plaintiffs' constitutional rights it is unnecessary for us to pass upon the question of personal liability on the part of defendants Oswald or LaVallee or of Oswald's knowledge of the Clinton incident or any liability therefor.

Judgment reversed; complaint dismissed; no costs.

OAKES, Circuit Judge (dissenting):

Appellate fact-finding is one thing. It violates Fed.R.Civ.P. 52(a), which provides that facts found by the trial court "shall not be set aside unless clearly erroneous," but no constitutional or statutory require-

---

3. *See, e. g., Fox v. Sullivan*, 539 F.2d 1065 (5th Cir. 1976); *Curtis v. Everette*, 489 F.2d 516 (3rd Cir. 1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); *Parker v. McKeithen*, 488 F.2d 553 (5th Cir.), *cert. de-*

*nied*, 419 U.S. 838, 95 S.Ct. 67, 42 L.Ed.2d 65 (1974). *See also, Mitchell v. Boslow*, 357 F.Supp. 199 (D.Md.1973); *Matthews v. Henderson*, 354 F.Supp. 22 (M.D.La.1973).

ments, *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Overruling our own circuit's decisions relative to the requirements of the due process clause of the Fourteenth Amendment is quite another; here constitutional as well as institutional considerations are involved. Because the majority opinion engages in appellate fact-finding and by implication overrules *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir. 1971) (en banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), while incidentally disregarding New York State's own regulations for the conduct of correctional institutions, I dissent.

### Facts

The facts actually found by Judge Port must be restated in order to put the case in its proper light. Prior to February 15, 1973, appellees were housed in "general population areas" at the Clinton Correctional Facility in Dannemora, New York, living under the usual prison conditions, which included certain programs and minimal amenities. *Gilliard v. Oswald,* No. 73–CV–249,

slip op. at 2 (N.D.N.Y. July 22, 1976) [hereinafter cited as Dist.Ct.Op.].[1] As a result of a number of assaults on February 15, in which appellees "were not involved," *id.* at 3, Superintendent LaVallee ordered the facility to be "completely closed down" and the entire population confined to their cells, *id.* at 2, *i. e.,* "keeplocked," as permitted "if necessary for the safety or security of the facility" by 7 New York Codes, Rules & Regulations [hereinafter cited as N.Y.C. R.R.] § 251.6(f).[2] During the ensuing several days, the entire facility was "thoroughly searched," and a large volume of weapons and other contraband was discovered, although none was found on appellees' persons or in their cells or "otherwise attributed to them." Dist.Ct.Op. at 3.

On February 23, 1973, appellees were transferred, without explanation, to special housing unit E, or "E-Block,"[3] where they were "deprived of most of the privileges and amenities they had been afforded in [the] general population." *Id.* at 3–4.[4] At no time were any of them "informed of any specific charges against them or why they were the subject of any investigation, and at no time were they given a hearing at

1. While confined in general population, plaintiffs were permitted, inter alia, to:
   a) participate in various institutional educational, vocational, recreational, exercise and religious services and programs;
   b) live in cells furnished with sink, bed, toilet, full sized locker, a desk and a chair;
   c) possess their personal property;
   d) intermingle with other inmates;
   e) leave their cells for substantial periods of time each day;
   f) eat their meals in the mess hall; and
   g) make purchases from the commissary.
   *Gilliard v. Oswald,* No. 73–CV–249, slip op. at 2 (N.D.N.Y. July 22, 1976) [hereinafter cited as Dist.Ct.Op.].

2. 7 New York Codes, Rules & Regulations [hereinafter cited as N.Y.C.R.R.] § 251.6(f) provides:
   The provisions of this section shall not be construed so as to prohibit emergency action by the superintendent of the facility and, if necessary for the safety or security of the facility, all inmates or any segment of the inmates in a facility may, on the order of the person in charge of the facility, be confined in their cells or rooms for the duration of any period in which the safety or security of the

   facility is in jeopardy. In any such case the superintendent shall immediately notify the commissioner.

3. Appellee Suggs was already in E-Block at the time. He testified that, after E-Block was declared a special housing unit, "many inmates were transferred out and the conditions became substantially more restrictive." Dist. Ct.Op. at 10 n.1.

4. The appellees were:
   a) denied participation in any institutional educational, vocational, recreational or religious services or programs;
   b) permitted to possess only limited items of their personal property;
   c) confined to their cells 23 hours a day;
   d) denied contact with inmates in the general population;
   e) permitted only 1 hour a day exercise in a small enclosed yard;
   f) permitted only one 15 minute period per week to both shower and wash their clothes;
   g) made to eat meals in their cells; and
   h) [denied any] opportunity to work or receive wages.
   *Id.* at 3–4.

which they could challenge their confinement in E-Block." *Id.* at 4.[5] This confinement, the district court found, *id.* at 8, violated the Correctional Services Department's own rules for "Admission to Special Housing Units," 7 N.Y.C.R.R. §§ 304.1 to 304.4, which are designed in part to ensure due process protection, *see United States ex rel. Walker v. Mancusi,* 467 F.2d 51, 52–53 & n.2 (2d Cir. 1972), and thus also violated the rule relating to transfer of prisoners from general to special housing, 7 N.Y.C.R.R. § 251.6(d).[6]

On March 12, 1973, again without explanation, hearing, or compliance with other departmental procedures, appellees were transferred to Unit 14, "the disciplinary housing unit at Clinton Correctional Facility, normally used for the confinement of inmates found guilty of serious violations of institutional rules." Dist.Ct.Op. at 4.[7] In Unit 14 appellees were:

a) denied participation in any program or activity which would allow them to have visual contact with any other inmate;

b) confined to cells furnished with only a metal bed, bedding, and a combination toilet and sink;

c) denied most of their personal property except limited reading and writing material, a shortened toothbrush, toothpaste and clothing;

d) subjected to strip searches and tear gassings;

e) permitted only 1 hour a day exercise in a small yard;

f) had no opportunity to work or receive wages; and

g) denied commissary privileges.

*Id.* at 4–5. In Unit 14, as in E-Block, *see* text at note 5 *supra,* appellees were not informed of any charges or of the reason for the investigation and were not accorded any hearing. *Id.* at 5.[8] Appellees were transferred out of Clinton on March 27 and 28. *Id.*

Specifically finding that "[n]o continuing state of emergency existed at the Clinton Correctional Facility from February 23, 1973 to late March 1973 which justified [appellees'] summary confinement in special housing units," and that both appellants Oswald and LaVallee "personally participated in the treatment accorded" appellees, *id.* at 5–6,[9] Judge Port awarded compensatory damages in almost the full amount of the appellees' ad damnum clauses, which the judge called "refreshingly realistic," *id.* at 2.[10]

*Appellate Fact-Finding*

The majority quite candidly concedes that it is fact-finding, stating: "With the court's finding that there was no continuing state of emergency from February 23, 1973 to late March, 1973, justifying plaintiffs' summary confinement in special housing . . . we disagree." The majority does not state that the finding was "clearly erroneous," as

**5.** They were also "never informed how long they would have to remain in E-Block." *Id.* at 4.

**6.** 7 N.Y.C.R.R. § 251.6(d) provides:
If the officer having charge of an inmate or if any superior officer has reasonable grounds to believe that an inmate's behavior in his cell or room is disruptive or will be disruptive of the order and discipline of the housing unit, or is inconsistent with the best interests of the inmate or of the facility, such fact shall be reported to the superintendent and the superintendent may order confinement in a special housing unit. Any such order shall be in accordance with Part 304 of Chapter VI [7 N.Y.C.R.R. §§ 304.1 to 304.4] of the rules and regulations of the department.

**7.** Martin Sostre was confined there for 17 months for failure to shave his ¼" beard. *See Sostre v. Preiser,* 519 F.2d 763 (2d Cir. 1975).

**8.** Appellees were again, *see* note 5 *supra,* not informed how long they would remain in special housing. Dist.Ct.Op. at 5.

**9.** The court also found that appellant Oswald was "informed and personally aware of the confinement of [appellees] under the above-stated conditions." *Id.* at 6.

**10.** Appellee Gilliard was awarded $715.00; Bloeth $748.25; and Suggs $740.00. *Id.* at 7. The amounts of the awards are not challenged by appellants.

is required to set aside trial court findings of fact under Fed.R.Civ.P. 52(a), but merely that it "disagrees." As the Supreme Court has reminded us: "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*. . . . The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did . . . .." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). *See also United States v. National Association of Real Estate Boards*, 339 U.S. 485, 495, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950) ("It is not enough [under Rule 52(a)] that we might give the facts another construction, resolve the ambiguities differently . . . .").

Far from being "clearly erroneous," the judge's finding was entirely proper. By February 19 the search of the facility was substantially complete, and, as was established by the testimony of Deputy Superintendent Gard and others, most inmates, including appellees, were released and permitted to go to the mess hall, the recreation area, and job facilities. On February 20 Superintendent LaVallee announced to the inmate population:

> [W]e are returning to normal as rapidly as possible.

> . . . . .

> On Wednesday, the 21 [*sic*], we will be as near normal as possible in terms of the search. Most shops and work areas will be open. The yard will operate normally

> . . . ..

Defendants' Exhibit H.

On February 22, 1973, appellant LaVallee wrote appellant Oswald: "Starting on Monday [February 19], programs were gradually resumed and it is anticipated that with

11. *Ray v. Rockefeller*, No. 71–CV–488 (N.D.N. Y.). An opinion giving some of the facts of this case and denying a preliminary injunction and class action certification can be found in 352 F.Supp. 750 (N.D.N.Y.1973).

some exceptions, normal activity will resume on Thursday." Defendants' Exhibit I. In a deposition in another action,[11] in evidence below, LaVallee testified on March 22, 1973—five weeks after the prison population was keeplocked and while appellees were still in Unit 14—that he had not "declared a state of emergency at this institution at any point during the past year" or informed the Department of Corrections "that there was an emergency . . . over the past year." Plaintiff's Exhibit 3. On the same date in that other action, Deputy Superintendent Gard testified, more accurately perhaps, that, while there had been an emergency in connection with the February shutdown, "[w]e reopened the facility Thursday following the shutdown . . . . Since that time we have not had a state of emergency."

With the correctional authorities themselves conceding under oath that there was no emergency existing, it is difficult to understand the majority's disagreement with Judge Port's finding that there was no emergency after February 23, 1973. The majority's disagreement is particularly perplexing because it purports to be deferring to the judgments of the men charged with running the prison, yet fails even to mention their own statements that there was no emergency. When to these concessions is added the evidence that the search of the inmates and their cells had been completed, the shutdown had ended, and normal prison life had been resumed, all of which Deputy Superintendent Gard conceded, it is beyond cavil that the record supports Judge Port's finding.

*The Due Process Law of This Circuit*

The majority also disagrees with Judge Port's legal conclusion that "[t]he disciplinary action taken against the [appellees] was in violation of [their] rights to due process of the law." Dist.Ct.Op. at 7.[12] In

12. It is not clear why the judge used the term "disciplinary action," since he not only found no misconduct on appellees' part but also found that "[t]hey were not given the reasons for [their] confinement; they were .not charged with any violations . . . ." Dist. Ct. Op. at

so doing, the majority relies upon *United States ex rel. Walker v. Mancusi, supra;* distinguishes *Sostre v. McGinnis, supra;* and fails to consider the other cases in this circuit bearing on the due process question. In each respect it seems to me that the majority decision is unsound.

*Walker* upheld the segregation in a special housing unit at Attica Correctional Facility of inmates who "were active participants in the bloody riots of September 9–13, 1971." 467 F.2d at 53. The segregation there involved "keeplocking," but the segregated inmates had access to showers, newspapers, magazines, and radio, had commissary and package privileges, and received wages. The court ruled that such segregation did not violate the Eighth Amendment (cruel and unusual punishment) or the equal protection or due process clause of the Fourteenth Amendment. With regard to the due process claim, Judge Mansfield for the court was careful to point out that, exactly contrary to the situation in the instant case, the Attica superintendent and his staff initiated adjustment committee proceedings for each of the segregated inmates in accordance with departmental rules; they also "reviewed each case, informed each inmate of the evidence against him, and gave him the opportunity to consent to continued restrictive confinement or to reply to the evidence against him." *Id.* There, too, "[s]ubstantial evidence of good cause for continued segregated confinement was found . . .," and a copy of the findings was furnished to each inmate, who was entitled to review by the Commissioner of Corrections. *Id.*

In *Walker,* in short, despite the fact that the inmates had evidently participated in riots, they were accorded due process pro-

tections. Here, by contrast, appellees received no similar protections, even though they had *not* participated in the assaults or been charged with any other violation. *Walker,* to be sure, does contain some broad language about the "wide discretion" of prison authorities in safety and security matters, *id.,* from which the majority opinion here draws a semblance of solace and with which I do not disagree. But *Walker's* holding was that "the procedures followed by the Attica authorities . . . while not as precise or detailed as might be required under other conditions, were sufficient to satisfy minimum requirements of 'fair play.' See *Sostre v. McGinnis,* 442 F.2d at 196." 467 F.2d at 53–54. Judge Port below found that here the department's own procedures "were not employed; nor were any other minimal due process procedures." Dist.Ct.Op. at 8. The majority opinion does not purport to state facts to the contrary. *Walker* is entirely inapposite.

The majority disposes of our en banc decision in *Sostre*[13] in two short sentences, distinguishing it and its progeny as decisions in which courts "faced situations involving specific harsh treatment accorded to a particular inmate." To be sure, *Sostre* did involve a "particular inmate," just as this case involves three particular inmates. True, *Sostre* also involved certain specific harsh treatment accorded that inmate ("punitive segregation"), just as this case involves specific harsh treatment, which was the substantial equivalent of that meted out in *Sostre.* Compare Dist.Ct.Op. at 3–5, *quoted in* note 4 and text following note 7 *supra, with* 442 F.2d at 185–87.

More important than the parallels between the instant case and *Sostre,* however, is the fact that a decision limited solely to

---

6. Perhaps he was using "disciplinary" in the broad sense of institutional action, without reference to punishment for a specific breach of prison rules.

13. At the time of the incidents here involved, *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), had not yet been decided. Because *Wolff* is expressly not retroactive, *id.* at 574, 94 S.Ct. 2963, *Sostre* is controlling here. *See Bloeth v. Montanye,* 514

F.2d 1192, 1194 & n.3 (2d Cir. 1975); *United States ex rel. Larkins v. Oswald,* 510 F.2d 583, 587 (2d Cir. 1975); *Williams v. Vincent,* 508 F.2d 541, 545 (2d Cir. 1974). Of course, I would not reach a different result if *Wolff* were applicable, since that case goes even further than *Sostre* in requiring that substantial deprivations of liberty in a prison context be accompanied by due process. *See Williams v. Vincent, supra.*

Martin Sostre's situation would hardly have merited the "extraordinary" step of en banc consideration, 442 F.2d at 181, which this court generally reserves for resolution of legal questions of broad significance. Certainly the *Sostre* court did not think its decision was limited in the way the majority today suggests. The en banc court there spoke of problems of this nature as "persistently seeking solution in the courts" and of the case as raising "important questions concerning the federal constitutional rights of state prisoners . . . ." *Id.* at 181.

*Sostre* held that, "[i]f substantial deprivations are to be visited upon a prisoner, it is wise that such action 'should at least be premised on facts rationally determined." *Id.* at 198. For an inquiry to meet minimum requirements of fairness and rationality, the court ruled, a prisoner must be "confronted with the accusation, informed of the evidence against him, . . . and afforded a reasonable opportunity to explain his actions." *Id.* In the instant case, it is undisputed both that appellees were subjected to substantial deprivations in E-Block and Unit 14, including, in the latter case, strip searches, tear gassings, and denial of personal property, work and commissary privileges, and eye contact with other inmates, *see* note 4 and text following note 7 *supra,* and that they did not receive even the rudiments of due process.

The post-*Sostre* cases in this circuit certainly have not viewed the en banc decision as limited to a one-prisoner situation. *Walker,* as noted above, cited *Sostre* in holding that the Attica inmates there involved *were* afforded minimal due process. 467 F.2d at 54. In *Wright v. McMann,* 460 F.2d 126 (2d Cir.), *cert. denied,* 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972), which involved two Clinton inmates when appellant LaVallee's immediate predecessor was warden, the court quoted at length from *Sostre* and summarized as follows: "In short, because we are loathe to graft onto state prison disciplinary hearings a broad panoply of procedural requirements does not mean that rudimentary due process can be ignored at the caprice of prison offi-

cials." *Id.* at 130. Other cases in this circuit have also viewed *Sostre's* due process holding as having general applicability beyond the facts of that case. *See e. g., Bloeth v. Montanye,* 514 F.2d 1192, 1194–95 (2d Cir. 1975); *United States ex rel. Larkins v. Oswald,* 510 F.2d 583, 587 (2d Cir. 1975). *See also Cunningham v. Ward,* 546 F.2d 481, 483 (2d Cir. 1976) (per curiam) (reversing summary dismissal of due process claim of keeplocking without procedural protection); *Powell v. Ward,* 542 F.2d 101 (2d Cir. 1976) (requiring hearings within seven days of confinement in "special housing" or segregation, except in emergencies). Numerous decisions of other circuits have taken a similar view of *Sostre's* broad significance. *See, e. g., Carlo v. Gunter,* 520 F.2d 1293, 1296 n.4 (1st Cir. 1975); *Clutchette v. Procunier,* 497 F.2d 809, 818 (9th Cir. 1974), *rev'd on other grounds sub nom. Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Meyers v. Alldredge,* 492 F.2d 296, 304 & n.23 (3d Cir. 1974) (terming *Sostre* "the leading case"); *Adams v. Carlson,* 488 F.2d 619, 625 (7th Cir. 1973); *Palmigiano v. Baxter,* 487 F.2d 1280, 1284 (1st Cir. 1973), *rev'd on other grounds,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Braxton v. Carlson,* 483 F.2d 933, 940 (3d Cir. 1973); *Adams v. Pate,* 445 F.2d 105, 108 (7th Cir. 1971); *Morrissey v. Brewer,* 443 F.2d 942, 961 (8th Cir. 1971), *rev'd on other grounds,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

### *Personal Responsibility of Appellants*

The majority did not need to reach, as I do, the question whether appellants should be held personally liable. It has been clear since *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), of course, that a state official who violates a person's federal constitutional rights may be held personally liable for the damages caused thereby. *See Scheuer v. Rhodes,* 416 U.S. 232, 237–38, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). To be held liable, however, the official must have had knowledge of the acts constituting the violation, *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir. 1973), and must have disregarded "basic, unquestioned con-

stitutional rights," *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

Judge Port, as stated, *see* text at & note 9 *supra,* found that appellants had personally participated in and were personally aware of the unconstitutional confinement of appellees and consequent denial of their rights. As to Superintendent LaVallee, this finding is not here challenged. As to Commissioner Oswald, he had received a memorandum from LaVallee, dated February 22, 1973, that told him that "47 men remain in KL [keeplock] status with no specific charge," to which was appended a list of names, including appellees', of those "in KL pending investigation and screening process." Defendants' Exhibit I. On March 2, a supplemental list was sent to Deputy Commissioner Quick on which appellees were listed as continuing in keeplock status, Defendants' Exhibit K; this list was described by Deputy Superintendent Gard as being sent to "updat[e] the Commissioner." Gard also testified that "the Commissioner's office" sent a Corrections Department counsel to the prison "to assist the [prison] administration," as is further indicated by Defendants' Exhibit J. Finally, even were these items not in the record, Oswald's knowledge could be deduced from Corrections Department regulations requiring that he be notified "immediately" upon the confinement of inmates to their cells or the designation of special housing units and that he be informed of the conditions therein. 7 N.Y.C.R.R. §§ 251.6(f), 302.2, 302.3.

Hence, there was abundant evidence that Oswald "knew or should have known," *Wright v. McMann, supra,* 460 F.2d at 135, of the conditions of appellees' confinement. *See also Mukmuk v. Commissioner,* 529 F.2d 272, 275–76 n.5 (2d Cir.), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2238, 48 L.Ed.2d 838 (1976); *United States ex rel. Larkins v. Oswald, supra,* 510 F.2d at 589. At the very least, this evidence established a prima facie case of knowledge, and appellants offered no evidence to the contrary. The person who could best describe what Oswald knew, Commissioner Oswald himself,

did not even testify at the trial. Judge Port's finding of Oswald's personal knowledge, then, far from being "clearly erroneous," is strongly supported by the record.

On the issue whether the law in this area was "settled, indisputable," "established," or "unquestioned," as is required under *Wood v. Strickland, supra,* 420 U.S. at 321–22, 95 S.Ct. 992, before § 1983 liability for violations of the law can be imposed, it is relevant that *Sostre v. McGinnis, supra,* was decided by this court in February, 1971, two years before the events here in question, and that *Wright v. McMann, supra,* was decided almost a year before the events. Given these two decisions, no state prison official could reasonably have believed in February, 1973, that substantial deprivations could be visited upon inmates without granting them any form of due process. *See The Supreme Court, 1974 Term,* 89 Harv.L.Rev. 47, 222 (1975) (citing *Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. 992, for proposition that public officials are chargeable with greater awareness of law in their field than would be expected of persons in the street); *cf. Landman v. Royster,* 354 F.Supp. 1302, 1318 (E.D.Va.1973) (Merhige, J.) (prison practices "of such a shocking nature that no reasonable man could have believed that they were constitutional"). Far from involving "unforeseeable constitutional developments," *O'Connor v. Donaldson,* 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), *citing Wood v. Strickland, supra,* the law in this area at the relevant time was about as "settled" and "unquestioned" as law can ever be in our system of case-by-case development of the contours of constitutional rights.

### Conclusion

The majority opinion reminds us, and I agree, that "we should look to the actual situation which confronted" Superintendent LaVallee. Reference is also made to his "experience," "discretion," and "judgment," with the suggestion that we should be extraordinarily deferential thereto. I will not comment further upon the lack of deference to the trial judge's findings with which the majority disagrees. But I do not think

that in the long run it is useful to correction officers themselves to defer to such an extent as to permit them to violate the minimal constitutional requirements of fair play. Their violation of the law establishes an atmosphere within the prison that makes it more difficult to administer. Judge Coffin of the First Circuit stated my sentiments exactly in *Palmigiano v. Baxter, supra,* 487 F.2d at 1283:

> Time has proved . . . that blind deference to correctional officials does no real service to them. Judicial concern with procedural regularity has a direct bearing upon the maintenance of institutional order; the orderly care with which decisions are made by the prison authority is intimately related to the level of respect with which prisoners regard that authority. There is nothing more corrosive to the fabric of a public institution such as a prison than a feeling among those whom it contains that they are being treated unfairly.

Finally, one may note with some irony the proposition advanced toward the end of the majority opinion: "[A]t this stage the Superintendent's acts were entirely administrative and the proceedings purely investigatory. . . . The situation was not ripe for definite charges—and charges should not be made until facts justifying them are obtained." I applaud the recognition that charges should not be made until justifying facts are obtained. But I ask whether punishment should be visited upon those as to whom no facts are at hand to support suspicions, while those as to whom there is evidence of misconduct receive hearings and clear dispositions of their cases, as is said to have happened here. For Unit 14, where each of appellees spent over two weeks, was the very place used for punishment at Clinton, according to testimony of Superintendent LaVallee,[14] who also said that persons placed there for their own protection or for transfer are generally treated the same as those for punishment. Plaintiffs' Exhibit 3. Any parallel to Al-

ice's Queen's dictum, "Sentence first—verdict afterwards," is purely coincidental.

I dissent and would affirm Judge Port's modest judgment, well-founded as it was in fact and law.

---

14. Deposition of March 22, 1973, *Ray v. Rockefeller,* No. 71–CV–488 (N.D.N.Y.).