Clyde COLLINS, Jr., and Lawrence
Epps, Plaintiffs,

v.

Benjamin WARD, Commissioner, New
York State Department of Correctional
Services, Robert J. Henderson, Superintendent, Auburn Correctional Facility,
and Stephen Dalsheim, Superintendent,
Auburn Correctional Facility, Defendants.

No. 78 Civ. 2007.

United States District Court,
S. D. New York.

June 30, 1982.

Clyde Collins, Jr., Lawrence Epps, pro se.

Robert Abrams, Atty. Gen., State of N. Y., New York City, for defendants; Eleanor Janosek Doyle, Deputy Asst. Atty. Gen., New York City, of counsel.

## MEMORANDUM AND ORDER

OWEN, District Judge.

Plaintiffs Clyde Collins, Jr. and Lawrence Epps are convicted felons who are serving terms of incarceration at Auburn Correctional Facility ("Auburn") and Attica Correctional Facility, respectively. They and two other inmates whose complaints have been dismissed brought this action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, against defendants Benjamin Ward, former Commissioner of the state Department of Correctional Services, Robert Henderson, Superintendent of Auburn, and Stephen Dalsheim, former Superintendent of Ossining Correctional Facility ("Ossining"), alleging many and various violations of

their constitutional rights. Defendants now move for judgment on the pleadings, Fed.R.Civ.P. 12(c), or, in the alternative, for summary judgment, Fed.R.Civ.P. 56.[1]

The facts, taken from allegations in the complaint and undisputed statements contained in affidavits filed by the parties in connection with the instant action,[2] appear as follows. From August 8 to August 18, 1977, nearly all of the inmates at Auburn engaged in a prison-wide work-stoppage strike in an effort to induce the state legislature to enact a "good-time" bill. Striking prisoners refused to obey the orders of the prison staff, creating what correction officials perceived to be a security risk. Inmates who were reluctant to join the strike were threatened with reprisals, and the cell of one inmate was set on fire. When the situation appeared to become even more tense, prison authorities ordered the emergency transfer of the leaders of the strike to other institutions. Accordingly, between August 13 (the sixth day of the strike) and August 18, 1977, seventy-nine inmates were transferred out of Auburn, of whom thirty-nine were sent to Ossining. Plaintiffs were among a group of twenty-three Auburn inmates that was transferred to Ossining on August 14. Plaintiffs remained at Ossining until August 29.

At about the same time, inmate riots erupted in two other state prisons, Eastern Correctional Facility ("Eastern") and Woodbourne Correctional Facility ("Woodbourne"). In response to these disturbances, defendant Ward authorized additional emergency transfers of inmates from those facilities. Approximately ninety-one inmates were transferred out of Eastern and Woodbourne, of whom approximately eighty-eight were sent to Ossining.[3] Thus, at the time of plaintiffs' transfer there, Ossining had received a total of approximately 127 emergency transferees from three institutions that had experienced major disturbances.

All of these new arrivals to Ossining were housed on the south side of "A" Block. In the approximately six weeks prior to the transfer, A Block had been undergoing renovations. It is clear, however, from defendants' unchallenged documentary evidence and from undisputed assertions in defendants' affidavits, that the renovations on the south side of A Block were virtually completed by the time plaintiffs and about 125 other emergency transferees arrived there. Although defendants concede that the work continued on the north side of A Block, no work was done after 10:00 p. m. on week nights or on weekends. After a total of fifteen days at Ossining, plaintiffs were transferred on August 29, 1977 to Clinton Correctional Facility for permanent placement.

Plaintiffs initiated this action in the Northern District of New York. Their complaint contained several alleged causes of action arising out of two factual situations. First, plaintiffs claimed that their transfer from Auburn to Ossining was effected in violation of their constitutional guarantee of due process. Second, plaintiffs alleged a host of constitutional deprivations arising from the conditions of their confinement while at Ossining awaiting transfer to a permanent placement. Defendants moved to dismiss the complaint for failure to state a claim, Fed.R.Civ.P. 12(b)(6), and for improper venue, Fed.R.

1. Plaintiff Epps was given leave to file, and, on December 19, 1980, he did file a supplemental complaint. Fed.R.Civ.P. 15(d). Defendants also move to dismiss the supplemental complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

2. Defendants submitted voluminous materials outside the pleadings in support of their motion for judgment on the pleadings. On July 14, 1981, the Court wrote to plaintiffs, inviting them to submit similar material in opposition to the motion, and plaintiffs did so on August 25, 1981. These materials have been considered, where appropriate, and, accordingly, defendants' motion will be treated as one for summary judgment.

3. At the time of plaintiffs' transfer to Ossining, the facility was a maximum security prison which served as a processing center for new and transferred inmates. Such inmates, including plaintiffs, were assigned to Ossining for a short time and then dispatched for the duration of their sentences to other prisons.

Civ.P. 12(b)(3), before Judge Port of the Northern District of New York. Judge Port dismissed for failure to state a claim all of plaintiffs' claims arising from the transfer to Ossining and transferred the balance of the case to this district where venue lay for the claims arising from the conditions of confinement. *Collins v. Ward*, No. 78–40 (April 13, 1978 N.D.N.Y.). No appeal was taken from the dismissal of the claims arising from the transfer out of Auburn.

Since the time the case was transferred here, plaintiffs' motions for class certification and to add another defendant have been denied, and two other plaintiffs, Cephus Wheeler and John Secure, have been dismissed for failure to comply with defendants' discovery requests. As noted above, plaintiff Epps also has filed a supplemental pleading. Defendants now seek summary judgment with respect to plaintiffs' remaining allegations and an order dismissing plaintiff Epps's supplemental complaint.

■ I turn first to defendants' motion for summary judgment. I note at the outset that I have reviewed all of the pleadings, answers to interrogatories, and affidavits submitted herein, and I conclude that there exists no genuine issue of material fact to preclude the grant of a summary judgment.[4] Fed.R.Civ.P. 56(e); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The remaining allegations of plaintiffs' joint complaint contend that the conditions of their confinement at Ossining violated various rights conferred by the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the Constitution of the United States. These allegations, distilled from plaintiffs' fourteen-page, one hundred-paragraph complaint,

may be summarized as follows. Plaintiffs contend:

(1) that for the first three days of their confinement at Ossining their cells were filthy and lacked tables, chairs, and storage cabinets, that some inmates lacked towels and washcloths, that their food was contaminated by flies and human hair, and that they were subjected to the noise of construction, including the sound of jack-hammers, on A Block twenty-four hours a day;[5]

(2) that for the first five days of their confinement plaintiffs were not permitted to receive visitors and that they could not obtain postage needed to mail overweight packages;

(3) that for the fifteen days of their confinement plaintiffs were segregated from the regular inmate population at Ossining, were denied employment, and were not permitted to participate in vocational or educational training programs;

(4) that plaintiffs were deprived of adequate medical attention because for the first six days of their confinement no doctor was available and they were permitted to see only a nurse at sick call and because poor record-keeping prevented continuity of medical and dental treatment during plaintiffs' fifteen-day stay at Ossining;

(5) that for seven days during their strike at Auburn and for the fifteen days they were confined at Ossining plaintiffs were denied access to the respective prisons' law libraries;

(6) that while they were confined at Ossining plaintiffs were not permitted to attend religious services;

(7) that while they were confined at Ossining plaintiffs were denied the services of counselors;

---

4. Although incarcerated and unrepresented, plaintiffs have some obligation to raise any genuine fact issue which they contend requires a trial, *cf. Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir. 1972), although they obviously need not comply with the same stringent standards to which courts hold attorneys. *See Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even the most generous reading of

their interrogatory answers and affidavit, however, fails to reveal any issue of material fact.

5. In his answers to defendants' written interrogatories, plaintiff Collins admits that he did not observe any jack-hammers at Ossining. He continues to claim that jack-hammers were in operation, but he now contends that they could be heard only between 8:00 a. m. and 5:00 p. m.

(8) that for the first three days of their confinement at Ossining plaintiffs were unable to exercise, that for the first seven days they were not permitted to go outdoors, that for the first eight days they lacked the necessary equipment to listen to the radio, and that they were not permitted to watch television;

(9) that during their confinement at Ossining plaintiffs were denied access to books and tobacco; and

(10) that virtually all of the inmates transferred from Auburn to Ossining suffered the loss, theft, damage, or destruction of some personal property at the hands of the agents and employees of defendant Henderson, the Auburn superintendent.

In reviewing these allegations it is important to keep in mind the circumstances giving rise to plaintiffs' complaint. In August 1977, the prison authorities were faced with riots at two correctional facilities and a strike at a third facility. The authorities perceived that an emergency situation existed at these three prisons, and they took steps to ease that emergency by, for example, transferring certain inmates from the troubled facilities. Pursuant to the procedures of the state Department of Correctional Services, many of the transferred inmates were housed temporarily in Ossining, pending processing and assignment to a permanent facility. Plaintiffs do not contend that defendants did not perceive the existence of an emergency situation in the prison system; they only dispute whether an emergency in fact existed at Auburn at the time of the inmate strike.

A court will not, however, second-guess an on-the-spot decision by prison officials that an emergency exists, at least in the absence of an allegation that the emergency declaration was made in bad faith or as a pretext to deprive plaintiff prisoners of their constitutional rights. *Gilliard v. Oswald*, 552 F.2d 456 (2d Cir. 1977); *La Batt v. Twomey*, 513 F.2d 641, 647 (7th Cir. 1977); *Hoitt v. Vitek*, 497 F.2d 598, 600 (1st Cir. 1974); *see Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). Because plaintiffs do not allege that defendants acted in bad faith in declaring an emergency at Auburn and the other prisons in August 1977, that declaration is not subject to review here. Accordingly, plaintiffs' allegations must be considered in light of the existence of prison emergencies at both Auburn and Ossining at the time plaintiffs' alleged causes of action arose.

The existence of a temporary emergency is crucial to the evaluation of plaintiffs' claims herein. They do not contend that for the entire terms of their incarceration prison officials have denied them medical treatment and exercise or that their food is always contaminated by hair and insects. They restrict their complaints to the fifteen days from August 14 to 29, 1977. In the main, they claim that the conditions of their confinement at Ossining over this fifteen-day period were so horrendous as to constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution. Thus, the question before me is not whether the conditions of confinement, as they emerge from the undisputed statements in the affidavits and the complaint, would violate the constitutional rights of inmates if the conditions were maintained permanently; the question is only whether those conditions were cruel and unusual in light of the temporary emergency which arose at Auburn and then at Ossining.

The occurrence of an emergency in a prison necessarily entails restrictions on the customary freedom and privileges of the inmates thereon. *E.g., La Batt v. Twomey, supra*, 513 F.2d at 648. Whether such restrictions violate the constitutional rights of the inmates, however, depends on their severity and the length of time they are in effect. *E.g., La Batt v. Twomey, supra; Hodges v. Klein*, 421 F.Supp. 1224 (D.N.J. 1976); *see Hutto v. Finney*, 437 U.S. 678, 686, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1977) ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months.") It is with these provisos in mind that I now turn to a determination of whether the various conditions of plaintiffs'

confinement for fifteen days at Ossining amounted to punishment that shocks the conscience, *e.g., Sostre v. McGinnis,* 442 F.2d 178, 191 (2d Cir. 1971) (*en banc*), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), or that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,'" *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (citation omitted).

■ From a review of the record herein, I conclude that defendants did not cause cruel and unusual punishment to be visited on plaintiffs. To begin with, the longest any condition of confinement was imposed on plaintiffs was fifteen days, the entire length of their stay at Ossining. Even if all of plaintiffs' allegations were true—the affidavits show otherwise—the failure of the prison officials to provide chairs, tables, towels, books, employment, training programs, and televisions to the inmates for the fifteen days plaintiffs waited at Ossining for certain and immediate transfer to another facility can in no way be labeled indecent or shocking to the conscience. Similarly, dirty cells for three days, no exercise for three days, no visitors for five days, confinement to the indoors for seven days, and no radio for eight days simply do not make out a claim of "barbarous" or "shocking" treatment. *E.g., Church v. Hegstrom,* 416 F.2d 449 (2d Cir. 1969). This conclusion is further compelled by the fact that an emergency gave rise to the conditions of which plaintiffs complain. Without warning, Ossining suddenly became a way station for about 127 inmates, all of whom had been extricated from dangerous or potentially dangerous situations at other prisons. The authorities' decision to segregate these inmates from the regular inmates at Ossining and confine them in the vacant A Block will not be reviewed for prudence by this Court looking with hindsight and detachment at the facts with which defend-

ants were confronted in 1977.[6] I conclude that the allegations above fail to state a claim of cruel and unusual punishment.

■ I reach the same conclusions in reviewing plaintiffs' claims that they were denied medical attention, that they were served contaminated food, that construction in the cell block prevented sleep, and that they were denied postage for packages. It is clear from the affidavits and documentary evidence herein that postage was provided at no charge and that construction on A Block was confined to reasonable periods during the day. (No jackhammers were used during the period of plaintiffs' confinement.) As for medical treatment, plaintiffs admit that for the six days before they saw a doctor, defendants provided a daily sick-call period and made a nurse available. Moreover, plaintiffs claim neither that they required medical attention nor that defendants evidenced "deliberate indifference to serious medical needs." *Estelle v. Gamble, supra,* 429 U.S. at 106, 97 S.Ct. at 292. Finally, plaintiffs' claim that their food contained hair and flies for the first three days of their emergency confinement fails to allege either the personal involvement of the three defendants, *McKinnon v. Patterson,* 568 F.2d 930 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), or that the contamination was deliberate or even with the knowledge of defendants, *e.g., La Batt v. Twomey, supra,* 513 F.2d at 648. Accordingly, all of these allegations fail to state a claim of cruel and unusual punishment.

■ Plaintiffs claim four additional violations of rights guaranteed them by the Constitution. First, they contend that their right to free exercise of religion, guaranteed by the First and Fourteenth Amendments, was infringed by the refusal of defendant Dalsheim's employees to permit plaintiffs to gather for group religious services during their fifteen-day confinement at

---

**6.** The decision to segregate the transferees in A Block did not violate plaintiffs' right not to be deprived of freedom without due process of law. Such a decision, in the face of a prison emergency and of such limited duration, should remain with the corrections experts on the scene. *See Gilliard v. Oswald, supra; Gomes v. Travisono,* 490 F.2d 1209, 1915 (1st Cir.), *cert. denied,* 418 U.S. 910, 94 S.Ct. 3202, 41 L.Ed.2d 1156 (1974).

Ossining. Such an allegation obviously fails to allege the requisite personal involvement of defendant Dalsheim. *McKinnon v. Patterson, supra.* In addition, the record reflects that clergy were available upon request and that the prohibition on group services continued only during plaintiffs' emergency confinement in A Block. For these reasons, plaintiffs fail to state a claim under the First Amendment.

■ Second, plaintiffs contend that they were not permitted to consult with counsel for the first five days of their confinement at Ossining. Plaintiffs again blame employees of defendant Dalsheim, not Dalsheim himself, for this alleged deprivation of their Sixth Amendment right to counsel. Thus, the allegation, by failing to allege Dalsheim's personal involvement, fails to state a claim. Moreover, it is undisputed that Dalsheim did not assume the position of Superintendent of Ossining until August 23, 1977, approximately five days after the end of the five-day period during which plaintiffs claim they could not visit with counsel. For this reason, too, plaintiffs' allegation that they were denied the right to counsel fails to state a claim.[7]

■ Third, plaintiffs contend that they were denied access to the Auburn law library during the seven days of their strike and that they were denied access to the Ossining law library for the entire fifteen days of their confinement there, all in violation of unspecified constitutional rights. While it is clear that incarcerated litigants are entitled to meaningful access to the courts, *cf. Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the temporary suspension of law library privileges during a perceived prison emergency will not give rise to a claim for damages against prison officials seeking to alleviate the emergency conditions. Plaintiffs do not claim that their three-week absence from the law library in any way injured them or that it in any way deprived them of access to the judiciary. Moreover, it is clear from the record that law clerks from the law library visited the transferee inmates periodically and provided them with information and materials and that representatives of Prisoners' Legal Services visited and interviewed all inmates in A Block and then presented the inmates' grievances to the prison authorities. I conclude, therefore, that plaintiffs' claim that they were denied access to the law library fails to state a claim upon which relief can be granted.

■ Finally, plaintiffs claim that "[p]ractically all members of plaintiff class [sic] suffered confiscation, loss, theft, damage[,] and destruction of personal and legal property ...." Plaintiffs contend that "agents and officials" of defendant Henderson, the Auburn superintendent, were responsible for plaintiffs' loss of property. Plaintiffs again fail to allege that defendants were personally involved in the alleged deprivation of property without due process of law. *McKinnon v. Patterson, supra.* In addition, plaintiffs do not allege in their complaint, their answers to defendants' written interrogatories, or their affidavit in opposition to defendants' motion for summary judgment that they themselves were deprived of any property. Accordingly, this allegation, too, fails to state a claim upon which relief can be granted.

■ I turn now to plaintiff Lawrence Epps's supplemental complaint. Although Epps recites a variety of objections he has to being incarcerated, the only cause of action he appears to be asserting is one for the deprivation of certain training and rehabilitative programs as a result of his being categorized a "disciplinary transfer." These institutional programs, however, are not accorded plaintiff Epps as a matter of right and, therefore, are not protected by the due process clause of the Fourteenth Amendment. *See Moody v. Daggett,* 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 279 n.9, 50 L.Ed.2d 236 (1976); *Altizer v. Paderick,* 569 F.2d 812 (4th Cir.), *cert. denied,* 435 U.S. 1009, 98 S.Ct. 1882, 56 L.Ed.2d 391 (1978); *Diehl v. Wainwright,* 419 F.2d 1309 (5th Cir.

---

7. In his answers to defendants' written interrogatories, plaintiff Collins admits that he was not denied the right to consult with counsel; no attorney attempted to visit him at Ossining.

1970). Accordingly, plaintiff's claim that the denial of these training and rehabilitative programs violated his constitutional rights fails to state a claim upon which relief can be granted.

Given the foregoing, summary judgment is granted for the defendants with respect to the joint complaint of plaintiffs Collins and Epps, and that complaint is dismissed. Defendants' motion to dismiss plaintiff Epps's supplemental complaint for failure to state a claim is also granted, and that complaint is also dismissed.

SO ORDERED.